*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0165p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

EDISON GISHTA; MANJOLA GISHTA; ENEA GISHTA,
　　　　　　　　　　　　　*Petitioners,*

　　*v.*

No. 03-4101

ALBERTO GONZALES, Attorney General,
　　　　　　　　　　　　　*Respondent.*

> On Appeal from the Board of Immigration Appeals.
> Nos. A79 287 256;  A77 340 484; A77 340 485.

Argued:  December 9, 2004

Decided and Filed:  January 19, 2005[*]

Before:  MERRITT, GIBBONS, and ROGERS, Circuit Judges.

---

## COUNSEL

**ARGUED:**  Richard A. Kulics, IMMIGRATION LAW CENTER, Birmingham, Michigan, for Petitioners.  Daniel E. Goldman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON BRIEF:**  Richard A. Kulics, IMMIGRATION LAW CENTER, Birmingham, Michigan, for Petitioners.  M. Jocelyn Lopez Wright, David V. Bernal, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

## OPINION

---

　　JULIA SMITH GIBBONS, Circuit Judge.  Petitioners in this immigration case, Edison, Manjola, and Enea Gishta, are citizens and natives of Albania.[1]  The adult petitioners, Edison and Manjola, came to the United States approximately nine months apart and were placed in removal proceedings separately.  The family had a shared evidentiary hearing at which they were represented by the same attorney, but the judge maintained separate records of the proceedings for Edison and Manjola and issued separate orders of removal.  They filed a combined notice of appeal with the Board of Immigration Appeals ("the board").  The board issued separate decisions affirming the

---

[*]This decision was originally issued as an "unpublished decision" filed on January 19, 2005.  On March 15, 2005, the court designated the opinion as one recommended for full-text publication.

[1]Edison and Manjola Gishta are married and are the parents of Enea Gishta, who was sixteen months old when he entered the United States.

decisions of the immigration judge. The Gishtas filed this petition seeking review of the removal orders. For the following reasons, we affirm the Board of Immigration Appeals.

## I.

Edison Gishta was admitted to the United States on March 30, 2000.[2] His wife, Manjola Gishta, and son, Enea Gishta, attempted to enter the United States on January 16, 2001, by presenting photo-substituted passports to immigration officials at the Los Angeles International Airport. Mrs. Gishta admitted using a passport issued to an individual named Gitjana Duka in order to gain entry to the United States and told the Immigration and Naturalization Service ("INS") that she paid $17,000 for the passport. Her initial stated reason for coming to the United States was "[t]o be with [her] husband."[3] She also said that she planned to stay in the United States for as long as possible, but realized that Albania would "get better" and that she would eventually return home to Albania with her family. Mrs. Gishta also stated during the initial interview that she did not fear harm, imprisonment, or persecution upon returning to Albania, but wanted the chance of a better future that America provided.

The following day, Mrs. Gishta refused to board a plane to Italy and, after a phone call to the residence where Mr. Gishta was staying, a credible fear interview was conducted during which Mrs. Gishta indicated a fear of persecution if she returned to Albania.[4] The INS refused to admit Mrs. Gishta and her son, but ultimately referred her case for an asylum hearing and placed her in expedited removal proceedings by serving her with a Notice to Appear ("NTA") before an immigration judge.

The NTA charged Mrs. Gishta and Enea as arriving aliens who are inadmissible and subject to removal under INA § 212(a)(6)(C)(i), 8 U.S.C. § 1182(a)(6)(C)(i),[5] and INA § 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I).[6] After Mrs. Gishta was apprehended by immigration officials in January 2001, Mr. and Mrs. Gishta worked with an immigration attorney in Los Angeles to assemble an asylum application. Mr. Gishta submitted an affirmative application for asylum on May 7, 2001. The INS conducted an interview with Mr. Gishta on June 13, 2001, and subsequently rejected his asylum application as untimely filed[7] and initiated removal proceedings by filing with the immigration court an NTA charging him with removability under INA § 237(a)(1)(A), 8 U.S.C.

---

[2]The petitioners claim that the record is unclear as to when Mr. Gishta arrived in the United States. Mr. Gishta's Notice to Appear states that he was admitted to the United States on or about March 30, 2000. Mr. Gishta himself testified that he arrived on March 30, 2000. Nevertheless, the immigration judge mistakenly stated in the oral decision and order that Mr. Gishta was admitted to the United States on or about December 30, 2000, in Miami, Florida.

[3]In the interview Mrs. Gishta claimed that her husband's name was Beni and that he was mayor of the town where they lived in Albania.

[4]She stated that her "life [would] be in danger" if she was sent home, that her family "had been persecuted for being democrats," and that communists had beaten her and threatened to kill her son.

[5]The statute renders a person removable for seeking to procure a visa, other documentation, or entry into the United States by fraud or by willfully misrepresenting a material fact. 8 U.S.C. § 1182(a)(6)(C)(i).

[6]The statute renders a person inadmissible for lacking valid entry documents at the time he or she sought admission. 8 U.S.C. § 1182(a)(7)(A)(i)(I).

[7]The applicable statute requires an applicant seeking asylum to file his or her application within one year from the date of his arrival in the United States. 8 U.S.C. § 1158(a)(2)(B). Late filing is excusable if the applicant "demonstrates to the satisfaction of the Attorney General" either "changed circumstances which materially affect the applicant's eligibility for asylum" or "extraordinary circumstances relating to the delay." 8 U.S.C. § 1158(a)(2)(D).

§ 1227(a)(1)(A).[8]   Mr. Gishta admitted the factual allegations in the NTA and conceded removability.  The immigration judge ruled that Mr. Gishta's asylum application was pretermitted as untimely.  The judge also denied the Gishtas' request to consolidate their cases.

Mr. and Mrs. Gishta, along with Behar Lumani, Mr. Gishta's brother-in-law, testified at the evidentiary hearing held on January 23, 2002, in Detroit, Michigan.  Mrs. Gishta admitted that she gave inconsistent and inaccurate information to the INS during her airport and credible fear interviews, including an incorrect name for her husband, wrong birth dates, and different reasons as to why she did not want to return to Albania.  She stated that she gave inconsistent and inaccurate information because she was scared, not thinking clearly due to the fact that her son was ill, and unaware of what she was saying to INS officials.  Her testimony was that she did not realize what she had told INS officials until she arrived in Michigan and had the opportunity to read the documents relating to her interviews.  Mrs. Gishta also testified, contrary to what she said at the time of her second interview, that she did not speak with her husband on the telephone before the interview took place, but rather spoke only to her sister-in-law and brother-in-law.[9]   Mr. Lumani testified that he remembered Mrs. Gishta's phone call in detail, that he repeatedly told her to tell the truth, and that Mr. Gishta was not in the house when the call came.

The immigration judge gave the Gishtas the opportunity to make corrections to their asylum applications at the evidentiary hearing, but the Gishtas confirmed the truth and accuracy of the applications without making any changes to their applications.  Mrs. Gishta testified that her family members were all democrats and that she decided to become a member of the Democratic Party in 1996, when Behar Lumani was chosen as a leader.  As a member of the party, Mrs. Gishta testified that she attended meetings and demonstrations.  Likewise, Mr. Gishta testified that he began participating in democratic demonstrations in 1990 and joined the party in 1996.

The Gishtas were married in January 1998.  On September 14, 1998, Mrs. Gishta participated in a demonstration protesting the death of a democratic youth leader.[10]   She testified that thirty to forty police officers tortured the demonstrators by beating them with rubber sticks, punching and kicking them, and shooting them.  Her specific testimony was that police stopped the car she was riding in, beat her with a rubber stick, and shot the driver.  The immigration judge asked Mrs. Gishta why she failed to mention this incident in her written statement in support of her application to which she responded, "a lot of things I didn't say in the application, but it's the truth and it happened to me and I am here to say that and to declare that it happened to me and it's in my mind and in my heart and I lived that moment."

Mr. Gishta testified that he became Behar Lumani's chauffeur and bodyguard in 1997 or 1998, a position paid for by the democratic party.  He further testified that, because of his position, the socialist government issued a gun and ammunition to him.  He held the position until November 1999, when Mr. Lumani resigned his political position and emigrated with his family to the United States.  Mr. Gishta testified that at the end of November 1999, when he was stopped for driving too fast, Albanian police officers beat him and hit him in the back of the head with a pistol.  He further

---

[8]The applicable statute states that an alien who at the time of entry was inadmissible for lack of a valid visa or other entry document is removable.  8 U.S.C. § 1227(a)(1)(A); 8 U.S.C. § 1182(a)(7).

[9]Mr. Gishta also testified that he did not speak to his wife when the phone call came but was in the room with his brother-in-law and sister.

[10]Mr. Gishta's written asylum application asserts that he also participated in a protest on September 14, 1998, in which police officers used "leather strips and other batons" against the demonstrators.  It is not clear if Mr. and Mrs. Gishta attended the same protest.  Mr. Gishta did not mention the demonstration in his testimony nor allege any harm from the protest.

testified that the officers came to his house a few days later and took him to the police station where they held and beat him for three days.

Mr. Gishta testified that a day after he was released from the police station, he received a letter informing him that the police intended to arrest him and instructing him not to leave. His uncle took the letter to the police station to inquire into the reason for the impending arrest; the police kept the letter. Mr. Gishta testified that hours after he received the letter his friends took him to the city of Tirana. His written application states that he fled along with his mother, wife, and son to stay with a friend in Tirana, but his written statement asserts that he separated from his mother, wife, and son to stay with a friend in Tirana. Mr. Gishta testified at the hearing that he went to Tirana alone, leaving his family in Malij because he did not believe they would be in danger of being beaten by the police because they were not men. Mr. Gishta stayed in Tirana until he left Albania to join his sister and brother-in-law in the United States in March 2000.

Mrs. Gishta testified that she was arrested by Albanian police on March 31, 2000, after going to a neighbor's home at a prearranged time to receive a phone call from her sister-in-law in the United States letting her know that her husband had arrived safely. The police allegedly arrested her at home and took her to an isolated room in the police station, holding her for three days. She claims that over the three days the police questioned her about her husband, touched her inappropriately, knocked her unconscious, punched her, and hit her with a rubber stick. Mrs. Gishta testified that when she was released, she was warned that she would be arrested again if she did not stop her political activities.

Mrs. Gishta claims that she was arrested two additional times in September and December of 2000. She claims to have been held for a week and a half when she was arrested in September and that she was tortured five or six times. In December she alleges that she was held for three days and questioned by the same man who had questioned her during her previous two stays at the jail. She testified that the man who questioned her threatened to kill her son if she did not stop speaking out against communists. Her father gathered the money to pay for her to leave Albania, which she did three weeks later, in January 2001.

Mrs. Gishta was questioned about the fact that none of her arrests in 2000 were mentioned in the written asylum application originally submitted by Mr. Gishta in May 2001 on behalf of the entire family.[11] Both Mr. and Mrs. Gishta responded that the arrests were not included because it was Mr. Gishta's application, not Mrs. Gishta's. Mr. Gishta also testified that he was not aware of his wife's arrests because he was already in the United States when they allegedly occurred. Mr. Lumani testified that he saw Mrs. Gishta in Albania shortly after her release from her first alleged detention but that she did not mention the arrest at all nor have any visible injuries consistent with being kicked, punched in the face, or beaten with a rubber stick.

The immigration judge found the Gishtas subject to removal from the United States as charged, holding that they failed to meet their burden of proving eligibility for asylum and withholding of removal. Mr. Gishta's asylum application was denied on the ground that it was filed beyond the one-year deadline and no exception to that requirement was met. The judge also entered an alternative finding that, even assuming Mr. Gishta's application was timely, it would still fail on the merits. In addition, the immigration judge found that Mr. and Mrs. Gishta were not credible

---

[11]There is a specific question on Form I-589 asking whether any member of the applicant's family has ever been arrested.

witnesses[12] and that even if Mr. Gishta's testimony was credible, the incidents of mistreatment he described did not rise to the level of persecution and the application would still be denied. The judge ordered the Gishtas removed to Albania. The Gishtas appealed to the board, challenging the denials based on untimely filing and credibility grounds. The Gishtas argued that the interpretation provided at the hearing was inadequate. The board affirmed the immigration judge's decision on August 5, 2003. The board found that the Gishtas failed to demonstrate that they were prejudiced by any errors in interpretation. The case comes before this court on a petition for review of the board's final order.

## II.

We must consider whether the board correctly determined that the Gishtas failed to sustain their burden of establishing eligibility for asylum. The board's decision will be upheld if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Mikhailevitch v. INS*, 146 F.3d 384, 388 (6th Cir. 1998) (internal quotation omitted). This circuit has noted that this is a deferential standard under which the court cannot reverse the board's determination simply because it would have decided the matter differently. The relevant inquiry is whether the applicable evidence "was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *Id.* (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)).

## A.

The Gishtas argue that the interpretation provided at their removal hearings was a "cruel sham." The petitioners list six examples of "egregious" unintelligible translations that they argue impacted the immigration judge's credibility findings. The Gishtas rely on *Amadou v. INS*, 226 F.3d 724 (6th Cir. 2000), and *Gonzales v. Zurbrick*, 45 F.2d 934 (6th Cir. 1930), to argue that the interpretation problems violated their due process rights. In *Amadou*, this court held that the petitioner was deprived of his due process right to a full and fair hearing due to the incompetence of the interpreter. *Amadou*, 226 F.3d at 726 (citing *Perez-Lastor v. INS*, 208 F.3d 773, 777 (9th Cir. 2000)). In *Gonzales*, the court held that an alien was not afforded a full and fair opportunity to be heard because of the alien's failure to understand the proceedings, noting that "[t]he function of an interpreter is an important one . . . affect[ing] a constitutional right." *Gonzales*, 45 F.2d at 937.

The instant case is factually distinguishable from *Amadou* and *Gonzales*. The immigration judges were on notice that there were problems with the interpreters in *Amadou* and *Gonzales*. In *Amadou*, the interpreter stated that he or she did not understand what the petitioner was saying and was "having some problems . . . with some semantics" because the interpreter spoke a different dialect of Fulani than the petitioner. *Amadou*, 226 F.3d at 725, 727. In the instant case there was no indication that the interpreter was having a difficult time understanding the Gishtas or vice versa. Likewise in *Gonzales*, Ms. Gonzales complained during the proceedings that she could not understand the interpreter, which resulted in two successive interpreters being substituted.

---

[12]The immigration judge based his lack of credibility findings on the following inconsistencies: the admitted inconsistencies in Mrs. Gishta's statements to the INS during her airport interviews; the discrepancies between the Gishtas' testimony and their written asylum applications; discrepancies between the written applications and the written statements they submitted in support; false statements regarding the death of a democratic leader in Albania in Mr. Gishta's application and written statement; the omission of Mrs. Gishta's arrests in Mr. Gishta's original asylum application despite the question asking if any family members had ever been arrested; the testimony from Mr. Gishta that he was present in the room when Mrs. Gishta called the Lumani residence with the testimony of Mr. Lumani that Mr. Gishta was not in the house at that time; Mr. Lumani's testimony that he did not notice anything unusual in Mrs. Gishta's appearance when he saw her shortly after she alleges to have been released from detention during which she sustained punches to her face; and the contradictions between the Gishtas' claims concerning Albania and the State Department's reports on the country.

*Gonzales*, 45 F.2d at 935.  In contrast, the Gishtas never complained about the interpreter during the proceedings; they raised the issue for the first time in their administrative appeal.  Therefore, unlike *Amadou* and *Gonzales*, the immigration judge was never on notice of any alleged problem with the interpreter and the board specifically determined that Mrs. Gishta "failed to demonstrate that she suffered any harm that deprived her of due process, as she failed to demonstrate that there were any defects in the proceedings below which resulted in prejudice to her."

This case is also distinguishable from *Amadou* because the record does not indicate "that the interpreter's faulty translation directly prejudiced [the petitioner] because the judge and Board denied his application based on the testimony at the hearing." *Amadou*, 226 F.3d at 727.  "To prevail on a due process challenge to deportation proceedings, [an alien] must show error and substantial prejudice.  A showing of prejudice is essentially a demonstration that the alleged violation affected the outcome of the proceedings; we will not simply presume prejudice." *Larita-Martinez v. INS*, 220 F.3d 1092, 1095 (9th Cir. 2000) (quoting *Lata v. INS*, 204 F.3d 1241, 1246 (9th Cir. 2000)).  As the respondent points out:

> Here, petitioners have declined to demonstrate how the alleged inadequate interpretation at the hearing could have changed the inconsistencies in Mrs. Gishta's statements to the INS – indeed, nowhere do they challenge the adequacy of interpretation provided to Mrs. Gishta during the airport and credible fear interviews when the inconsistent statements were made.  Nor do they explain how the inconsistencies between their written applications, their testimonies, and the testimony [of] Mr. Lumani are attributable to the quality of interpretation.

The factors cited by the immigration judge in support of his credibility conclusions do not relate to the translation errors listed in the Gishtas' brief.  The transcript of the evidentiary hearing makes it clear that the Gishtas were responsive to the questions asked and that any isolated interpretation problems did not prejudice the petitioners.  Therefore, unlike *Amadou*, it is unlikely that the "the interpreter's faulty translation [ ] played a significant part in the judge's credibility determination." 226 F.3d at 727.  The transcript of the evidentiary hearing makes it clear that there is no truth to the Gishtas' assertion that it was "extremely difficult for [p]etitioner to understand what was being asked of him and fully and accurately respond."

Furthermore, the Gishtas argue that because the interpreter had been placed in removal proceedings herself for being in the United States illegally, she was not qualified or competent to serve as an interpreter.  This information should be disregarded because it comes from editorial statements and extra-record allegations.  *See* INA §242(b)(4)(A), 8 U.S.C. § 1252(b)(4)(A) ("the court of appeals shall decide the petition only on the administrative record on which the order of removal is based").  The Gishtas' inadequate interpretation argument provides no basis for reversing the denial of relief on the ground that they were not credible.

The Gishtas also allege that the immigration judge and the board abused their discretion in relying on the interpretation of a fraudulent and incompetent interpreter in denying the asylum claim.  The petitioners argue that they "have no idea what the rationale is behind the BIA's decision" and that the immigration judge's decision "appears more irrational than rational."  "The Board's discretion is broad but it is not unlimited.  It may not exercise its discretion in a way that is arbitrary, irrational or contrary to law." *Daneshvar v. Ashcroft*, 355 F.3d 615, 625-26 (6th Cir. 2004).  There is no indication in the record, contrary to petitioners' assertions, that either the immigration judge or the board acted arbitrarily, irrationally, or in a manner contrary to law.  The Gishtas are simply rehashing arguments raised elsewhere in their brief, none of which have merit.  The abuse of discretion claim is therefore rejected.

We conclude that the Gishtas' interpretation claim has no merit and that the immigration judge's credibility finding is supported by the record.

**B.**

The Gishtas argue that their due process rights were violated because the board failed to conduct a meaningful review of their claims on appeal. The board did not invoke its authority to affirm without opinion, but rather exercised the authority under 8 C.F.R. § 1003.1(e)(5) to "issue a brief order affirming, modifying, or remanding the decision under review . . ." *See* 8 C.F.R. § 1003.1(e)(4) (authorizing the board to affirm without an opinion). The board's independent review of the case is demonstrated by its citation of *In re Burbano*, 20 I. & N. Dec. 872 (BIA 1994), which states that a brief decision affirming the immigration judge's decision does not mean that the board did not exercise its independent review authority over the case, but rather the board adopts or affirms the immigration judge's decision when it is "in agreement with the reasoning and result of that decision." *Id.* at 874. As the respondent points out, the board's specific finding that the Gishtas' inadequate interpretation argument failed for lack of prejudice and provided no basis for reversing the immigration judge's decision also demonstrates that the board independently reviewed the case. Therefore there is no merit to the Gishtas' claim that the board did not engage in a meaningful review of their case.

**C.**

Although the immigration judge stated that Mr. Gishta arrived in the United States on December 30, 2000, the evidence is conclusive that Mr. Gishta in fact arrived on March 30, 2000. It is clear that the immigration judge erred in stating that Mr. Gishta arrived on or about December 30, 2000. The Gishtas make much of this mistake because if Mr. Gishta had in fact arrived in December 2000, then his asylum application would have been filed within the one year time limit set forth in INA § 208(a)(2)(B), 8 U.S.C. § 1158(a)(2)(B).

We affirm the board's decision on the ground that Mr. Gishta's application was untimely filed. In addition to the fact the fact the record is clear that Mr. Gishta arrived in March 2000, more than a year before he filed his asylum application, the board's finding that the application was untimely is not subject to judicial review. *Castellano-Chacon v. INS*, 341 F.3d 533, 544 (6th Cir. 2003) (holding that the court is "barred from reviewing the BIA's decision denying Castellano's application on the basis that it was untimely and must therefore affirm the BIA's decision on this point").

**III.**

For the foregoing reasons, we affirm the decision of the Board of Immigration Appeals.