NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0665n.06
Filed: September 6, 2007

No. 06-3928

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | |
|---|---|
| LORENC RAMO, | ) |
| | ) |
| Petitioner, | ) |
| | ) ON PETITION FOR REVIEW OF |
| v. | ) AN ORDER OF THE BOARD OF |
| | ) IMMIGRATION APPEALS |
| ALBERTO GONZALES, | ) |
| | ) |
| Respondent. | |

**Before:** **BOGGS, Chief Judge; ROGERS, Circuit Judge; and CALDWELL, District Judge**[*]

**PER CURIAM.** Lorenc Ramo petitions for review of an order of the Board of Immigration Appeals denying his application for asylum and associated relief. Because we find that the determination of the Board of Immigration Appeals ("BIA") and the Immigration Judge ("IJ") was supported by substantial evidence, we deny the petition for review.

## I

Ramo is a native and citizen of Albania. In March of 1991 and 1992, he served as an observer for the Democratic Party at his polling place in Korce, Albania. Following these elections,

---

[*] The Honorable Karen K. Caldwell, United States District Judge for the Eastern District of Kentucky, sitting by designation.

he became a member of the Democratic Party. He states that seven incidents led him to flee Albania and request asylum in the United States.

First, in February of 1991, he was arrested, held for three days, and was mistreated and beaten. Second, on April 28, 1997, while getting coffee with two friends after giving a speech at a Democratic Party ("DP") rally, he was shot in both legs by an armed gang and threatened with death if he continued to speak against the Socialist Party. Third, on June 29, 1997, after working as an election observer, he was hit by two men and told to stop talking about manipulation of the election. Fourth, on October 22, 1997, a criminal gang destroyed his clothing store and left a note threatening to burn the store with him inside if he continued to support the DP. Fifth, on September 20, 1998, after participating in protests following the death of Azem Hadjari, he was hit by the police as they were intervening and dispersing the protesters. Sixth, on March 22, 1999, after denouncing government corruption and the Socialist Party during a radio interview, he and two friends were approached by three masked men who started hitting, punching, and kicking him. When his friends tried to intervene, the men pulled out weapons and threatened to shoot. Seventh, on August 1, 2000, he claims that he was involved in a DP political demonstration during which he was arrested and held for two nights at the police station, where he claims he was questioned, mistreated, and beaten until he passed out.

After the August 1 incident, Ramo believed that he could no longer stay in Korce and left for Greece on August 20, 2000. Once in Greece he obtained a Greek passport. He then traveled through several countries, into Canada, and then by truck into the United States, arriving by bus in Detroit on September 10, 2000. Ramo states that he has two brothers and one sister. One of his brothers

lives in the Detroit area. His remaining family lives in Salande, Albania. Upon arrival in the United States, Ramo became engaged to a former girlfriend of his from Albania. She was also a member of the DP and they had participated in political activities together.

Ramo applied for asylum in August 2001. Removal proceedings were instituted against him and he conceded removability. On November 18, 2004, an IJ held a hearing on Ramo's asylum application. The IJ issued an oral decision denying Ramo asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). The IJ found, first, that Ramo's testimony was not credible and that Ramo had only shown that he had been a member of the Democratic Party in Albania. The IJ noted that Ramo had submitted virtually no corroboration of his testimony, despite his wife's knowledge of the events, his brother's knowledge of the events (especially, as he was Ramo's business partner, the attack on Ramo's store), and much other possible evidence (such as affidavits from audience members at his rally speeches). The IJ also identified an inconsistency in the spelling of the last name of one of the men who was with him on the night that he was shot: it was spelled "Bekolli" in Ramo's asylum application, "Begolli" in his testimony, and "Beholli" in an affidavit from a friend. The IJ also dismissed the scar on one of Ramo's legs as evidence that he had been shot because the IJ, in his "lay view," determined that a bullet that created those scars would have had to hit a bone, which would have been inconsistent with Ramo's statements of the extent of his injuries.

The IJ then turned to the event that directly precipitated Ramo's departure from Albania. The IJ noted the discrepancy between Ramo's asylum application, in which Ramo stated that he was held for two nights and beaten extensively, and Ramo's testimony, in which he concluded he had only

been detained for one night. Ramo, upon being questioned, also admitted that his asylum application was inaccurate when it stated that after the August 20 incident, he stayed at home for two weeks until leaving for Greece out of fear of being harassed. In fact, as demonstrated by his passport, Ramo had traveled between Albania, Greece, and Turkey several times during that two-week period. Based on all of the above factors, the IJ found that Ramo's testimony was not credible and that Ramo had not established past persecution.

The IJ then noted that even had he found Ramo to be credible, he still would have denied Ramo's application for asylum because changed circumstances in Albania mean that, despite any past persecution, Ramo would not have a well-founded fear of future persecution. The IJ based this conclusion on both the various State Department reports in the record and the fact that Ramo's brother, also an activist in the DP, moved from Korce to another part of Albania and has lived there peacefully.

Upon appeal, the BIA affirmed and adopted the decision of the IJ.

## II

We review purely legal questions regarding the requirements of the Immigration and Nationality Act and the Convention Against Torture *de novo*. *Ali v. Ashcroft*, 366 F.3d 407, 409 (6th Cir. 2004). We review the BIA's credibility findings and factual determinations for substantial evidence. Specifically, we should uphold the denial of asylum or withholding of removal if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Ibid.* We "cannot reverse the board's determination simply because it would have decided the matter differently." *Gishta v. Gonzales*, 404 F.3d 972, 978 (6th Cir. 2005). We may only reverse a decision

if the evidence "not only supports a contrary conclusion, but indeed compels it." *Mikhailevitch v. INS*, 146 F.3d 384, 388 (6th Cir. 1998); *Huang v. Ashcroft*, 113 F. App'x 695, 699 (6th Cir. 2004); *see also* 8 U.S.C. § 1252(b)(4)(B) ("[T]he administrator's findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.").

The substantial evidence standard also governs the agency's credibility findings. *See Yu v. Ashcroft*, 364 F.3d 700, 703 (6th Cir. 2004) (holding that "[c]redibility determinations are findings of fact" that are reviewed "for substantial evidence, reversing only if any reasonable adjudicator would be compelled to conclude to the contrary." (citations omitted)). Adverse credibility findings are accorded substantial deference because the IJ is, "by virtue of [his] acquired skill, uniquely qualified to decide whether an alien's testimony has about it the ring of truth." *Sarvia-Quintanilla v. INS*, 767 F.2d 1387, 1395 (9th Cir. 1985). Though "an adverse credibility finding is afforded substantial deference, the finding must be supported by specific reasons. An adverse credibility finding must be based on issues that go to the heart of the applicant's claim. They [sic] cannot be based on an irrelevant inconsistency." *Liti v. Gonzales*, 411 F.3d 631, 637 (6th Cir. 2005)(quoting *Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004)).

## III

The decision to grant asylum is a two-step inquiry. The first step is whether the applicant qualifies as a refugee. Only if the petitioner qualifies as a refugee may the Attorney General choose to exercise his discretion and grant asylum. *Huang v. Ashcroft*, 113 F. App'x 695, 698 (6th Cir. 2004) (citing *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003)). The petitioning alien has the burden of proof at both stages. *Klawitter v. INS*, 970 F.2d 149, 151 (6th Cir. 1992) (citing 8 C.F.R. §§

208.5, 242.17(c)). A refugee is any person outside his or her home country who is unable or unwilling to return to that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42).

A well-founded fear of future persecution must be both subjectively genuine and objectively reasonable. *Abay v. Ashcroft*, 368 F.3d 634, 637 (6th Cir. 2004). An alien who satisfies the burden of establishing past persecution is presumed to have a well-founded fear of future persecution. *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004). This presumption may be rebutted by establishing by a preponderance of the evidence that since the persecution occurred, conditions in the alien's country have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted upon return. *Id*. at 950-51. A well-founded fear does not require proof that persecution is more likely than not. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987). Persecution "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Singh*, 398 F.3d at 401. When the alien's family continues to live unharmed in the country, this can be evidence that a well-founded fear is not objectively reasonable. *Gumbol v. INS*, 815 F.2d 406, 412-13 (6th Cir. 1987). An alien is not required to produce corroborating evidence of persecution; the alien's own testimony can be sufficient where believable, credible, and sufficiently detailed. *Pilica*, 388 F.3d at 954.

In this case, one of the IJ's grounds for denying Ramo asylum was that since Ramo was last persecuted, conditions in Albania have changed to such an extent that he no longer would have a

well-founded fear of future persecution. This conclusion is supported by substantial evidence. Ramo experienced the bulk of his claimed persecution from 1997-2000. The records contains evidence on conditions in Albania from 2000-2004. While the 2000 State Department report indicates that there was some evidence of politically motivated violence, those findings are less apparent in the 2001 State Department Profile of Asylum Claims and Country Conditions. The 2002 State Department Country Report on Human Rights Practices in Albania and the 2003 and 2004 State Department Profiles of Asylum Claims and Country Conditions do not identify any continuing politically motivated violence. This demonstrates a change from the time that Ramo was in Albania to the present situation. While it is true, as Ramo argues, that the IJ did not address a report by the private group Amnesty International, which does detail politically motivated abuses, that report is from 2001 and describes only occurrences from 2000 and earlier. There is no evidence in the record post-2001 that indicates continuing political violence.

While these State Department materials alone might not be enough to convince every fact finder that Ramo would have no fear of future persecution, they also certainly do not compel a contrary finding. Further, we have relied on, and commented favorably on, State Department reports in the past. *See Mullai v. Ashcroft*, 385 F.3d 635, 639 (6th Cir. 2004). Therefore, we hold that substantial evidence supports the decisions of the BIA and the IJ denying Ramo's petition for asylum.[1]

---

[1] Because changed conditions would cause us to deny Ramo relief even if he had been found credible, we do not decide whether the IJ's adverse credibility determination was supported by substantial evidence. While the substantial evidence standard is a deferential standard, adverse credibility findings must "be based on issues that go to the heart of the applicant's claim. They cannot

While the legal standards governing the grant of asylum, withholding of removal under the INA, and withholding of removal under the CAT differ, with a few exceptions (that are not relevant here), the legal standards governing withholding of removal and relief under the CAT are stricter than those governing the grant of asylum. *See Mikhailevitch*, 146 F.3d at 389; *Singh v. Ashcroft*, 398 F.3d 396, 404 (6th Cir. 2005). As we conclude that Ramo is not entitled to asylum, he is also not entitled to withholding of removal or relief under the CAT.

**IV**

Ramo's difficult task of convincing us that the IJ's and BIA's decisions were not supported by substantial evidence was certainly not made easier when his counsel, Carl M. Weideman, III, failed to appear for telephonic oral argument before this court. Mr. Weideman has since proffered an explanation for his absence, namely that he has been having problems with his telephone system that prevent him from consistently receiving calls. This, of course, does not explain why Mr. Weideman, upon not receiving a call from this court at the time of scheduled oral argument, failed to call this court to inquire as to the status of the argument – an oral argument that he requested. This is especially worrisome considering his statement to the court that at the time of oral argument he knew of the problems with his telephone system. Nevertheless, this court gave the case the same careful consideration that would have occurred had Mr. Weideman appeared. We therefore deny the *pro se* motion from Mr. Ramo requesting that an additional argument be scheduled.

---

be based on irrelevant inconsistenc[ies]." *Liti*, 411 F.3d at 637. While some of the inconsistencies identified by the IJ seem to meet this standard, others, such as the varied spellings of the name "Begolli," are more likely to be the result of translation/transliteration errors than deceit that goes to the heart of Ramo's claim.

**V**

For the reasons set out above, we DENY the petition for review.