**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 15a0652n.06

No. 14-4270

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Sep 24, 2015
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| ILZE KRUZE, | ) | |
| | ) | |
| **Petitioner,** | ) | ON PETITION FOR REVIEW |
| | ) | OF A FINAL ORDER OF THE |
| v. | ) | BOARD OF IMMIGRATION |
| | ) | APPEALS |
| LORETTA LYNCH, Attorney General, | ) | |
| | ) | |
| **Respondent.** | ) | **OPINION** |
| | ) | |

Before: BATCHELDER, MOORE, and ROGERS, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** Ilze Kruze, a native and citizen of Latvia,

petitions this court for review of an order of the Board of Immigration Appeals ("BIA") denying

her application for asylum, withholding of removal, and protection under the Convention Against

Torture ("CAT"). Kruze argues that the BIA's finding that her asylum application was frivolous

is erroneous, that translation errors denied her due process, and that the BIA erred in denying

withholding of removal and protection under CAT. For the reasons stated below, we **DENY**

Kruze's petition for review.

**I. BACKGROUND**

Kruze entered the United States as a non-immigrant visitor on February 1, 1998 and

remained beyond the expiration of her status. Administrative Record ("A.R.") at 828 (Form I-

589 at 1). On June 5, 2000, Kruze married Sergey Zhummaev in Indianapolis, Indiana. *Id.* at

847 (Marriage Certificate). Zhummaev is a citizen of Russia and is of mixed Russian and Uzbek

heritage. *Id.* at 829 (Form I-589 at 2); *id.* at 948 (Birth Certificate). Kruze and Zhummaev have one child, born in the United States in 2002. *Id.* at 829 (Form I-589 at 2).

In 2006, the Department of Homeland Security ("DHS") began removal proceedings against both Kruze and Zhummaev. *Id.* at 905 (Kruze Notice to Appear); *id.* at 1017 (Zhummaev Notice to Appear). Kruze conceded removability. *Id.* at 193 (Jan. 9, 2007 H'rg Tr. at 6). On April 3, 2007, she submitted a Form I-589 Application for Asylum and for Withholding of Removal. *Id.* at 828 (Form I-589). She included Zhummaev on her application. *Id.* at 829 (Form I-589 at 2).

Kruze stated in her written application that she "was persecuted and discriminated against because of [her] family's Russian heritage and [her] membership in the Russian Orthodox Church." *Id.* at 832 (Form I-589 at 5). She claimed that prior to leaving Latvia "someone shot a bullet through [her] window and twice [her] apartment was broken into" but the police "refused to help." *Id.* Kruze feared harm if she were to return to Latvia. *Id.* She explained that she was an "outcast" in her family and her daughter would "have a hard time in school." *Id.* Further, Kruze claimed that because of her "religion, ethnic heritage, and membership in a particular social group (age)" she would be "unable to find employment." *Id.* at 832, 837 (Form I-589 at 5 & Addendum). She also feared torture by the Latvian government and believed that her family would be "targets for extortion and other criminal enterprises." *Id.* at 833 (Form I-589 at 6).

Kruze's application was filed over nine years after her arrival in the United States, and thus was beyond the one-year deadline to apply for asylum. *See* 8 U.S.C. § 1158(a)(2)(B). In

her application, Kruze indicated that she did not file within one year of her arrival because she "did not know the language and [her] brother, Raitis, controlled everything." A.R. at 835 (Form I-589 at 8). Kruze explained that Raitis took her documents and money and that he attacked her. *Id.* At the April 3, 2007 hearing in which Kruze submitted her application, the IJ indicated that he did not believe her application "on its face" alleged "a viable excuse to miss the one-year deadline." *Id.* at 202 (Apr. 3, 2007 H'rg Tr. at 13). The IJ explained that he would "treat [the application] as a withholding application only and pretermit the asylum application," but that Kruze could "attempt to demonstrate" why the asylum application was timely at her merits hearing. *Id.* The IJ also asked Kruze whether she would need a Latvian translator for her merits hearing. *Id.* at 203 (Apr. 3, 2007 H'rg Tr. at 14). Kruze responded that "Russian be good also," and that there was "[n]o difference" as to which she preferred. *Id.* Because Zhummaev, who would also be a witness at the hearing, needed a Russian translator, the IJ requested a Russian translator for the merits hearing. *Id.* at 203–04 (Apr. 3, 2007 H'rg Tr. at 14–15).

Zhummaev appeared before the IJ on July 17, 2007. *Id.* at 206 (July 17, 2007 H'rg Tr. at 16). Through counsel, Zhummaev conceded removability but stated that he was a derivative on Kruze's application for asylum. *Id.* at 206, 208–09 (July 17, 2007 H'rg Tr. at 16, 18–19). The IJ consolidated the two cases, with Kruze as the lead applicant. *Id.* at 212 (July 17, 2007 H'rg Tr. at 22).

The consolidated merits hearing was held on September 29, 2008. *Id.* at 214 (Sept. 29, 2008 H'rg Tr. at 23). Addressing Kruze, the IJ stated: "Okay, ma'am, you filed an asylum

application." *Id.* at 217 (Sept. 29, 2007 H'rg Tr. at 26). Kruze answered, "Yes." *Id.* The IJ then explained that "[i]t was many years too late," but that "because you want to try to apply for asylum, I am required to give you a warning." *Id.* The IJ warned Kruze about the meaning and consequences of a frivolous application. *Id.* at 217–18 (Sept. 29, 2008 H'rg Tr. at 26–27). The IJ then asked Kruze whether she had "been over [her] application line-by-line and word-for-word with a competent translator." *Id.* at 218 (Sept. 29, 2008 H'rg Tr. at 27). Kruze responded that she had. *Id.* Kruze was then given the opportunity to make changes to her application. She corrected the date of her second entry to the United States, the date of her marriage, and the spelling of her child's name. *Id.* at 218–22 (Sept. 29, 2008 H'rg Tr. at 27–31).

Kruze then testified that it would "be a disaster" if she returned to Latvia with her family because her husband is Russian and their child speaks only English. *Id.* at 236–37 (Sept. 29, 2008 H'rg Tr. at 45–46). When asked whether anything had happened to her prior to leaving Latvia, Kruze answered that "[t]here was some small incident, but that is nothing to do with nationality." *Id.* at 239 (Sept. 29, 2008 H'rg Tr. at 48). Kruze was also asked whether she attributes any of the harm that she suffered to her membership in the Russian Orthodox Church. *Id.* at 240 (Sept. 29, 2008 H'rg Tr. at 49). Kruze answered: "Possibly." *Id.* She later explained that, when she was in school, she was once punished for attending a Russian Easter Service. *Id.* at 242 (Sept. 29, 2008 H'rg Tr. at 51).

Kruze clarified that when she indicated in her written application that she was persecuted because of her heritage and religion, she "meant that it[] could happen" if she were to go back

with her Russian husband and child. *Id.* at 241 (Sept. 29, 2008 H'rg Tr. at 50). She further explained that her Latvian family was very nationalistic and that they did not accept her marriage to a Russian. *Id.* at 243–46 (Sept. 29, 2008 H'rg Tr. at 52–55). She stated that her brother reacted badly to her marriage and took her car keys and documents and threatened her husband. *Id.* at 248 (Sept. 29, 2008 H'rg Tr. at 57).

When asked whether she wanted to file her asylum application earlier, Kruze responded: "Before I married, there was no need for me to." *Id.* at 251 (Sept. 29, 2008 H'rg Tr. at 60). On cross-examination, the DHS attorney attempted to confirm that her need for asylum arose after her marriage. *Id.* at 253 (Sept. 29, 2008 H'rg Tr. at 62). Kruze stated: "If you're talking just about political asylum, yes." *Id.* The DHS attorney asked "Well, that's why we're here, right?" Kruze answered, "Yes." *Id.* Kruze further told the DHS attorney that while living in Latvia she had traveled to several countries. *Id.* at 255 (Sept. 29, 2008 H'rg Tr. at 64).

The IJ then questioned Kruze. Kruze told the IJ that her brother took documents from her in November of 1999, prior to her marriage. *Id.* at 257 (Sept. 29, 2008 H'rg Tr. at 66). She confirmed that her "need to apply for political asylum didn't arise until" after her marriage. *Id.*

Following her testimony, the IJ warned Kruze that her asylum application may be frivolous. *Id.* at 320 (Sept. 29, 2008 H'rg Tr. at 129). He instructed her that she had the opportunity to explain inconsistencies, including: (1) her testimony that she did not know why the robbery and shooting of her apartment occurred, despite her written application stating that it occurred because of her religion and heritage; (2) her testimony that she had never been

persecuted because of her heritage or religion; (3) her statement in her written application that she did not return to Latvia after the harm was inflicted upon her, despite her testimony that she had traveled to other countries and returned to Latvia several times; (4) her written statement that she did not file within one year because her brother took her documents and money, although she testified that her need for asylum did not arise until later. *Id.* at 320–21 (Sept. 29, 2008 H'rg Tr. at 129–30).

The IJ then allowed Kruze to discuss each of these concerns with her lawyer and gave Kruze an opportunity to clarify the inconsistencies. *Id.* at 321 (Sept. 29, 2008 H'rg Tr. at 130). When asked why she stated that she was persecuted based on her religion, Kruze answered that she "still need[ed] to translate from Russian to Latvian to understand the question" and she was referring to her current family and the future, not her parents and other relatives in Latvia. *Id.* at 331–32 (Sept. 29, 2008 H'rg Tr. at 140–41). The IJ also asked her why her application stated that she had not returned to Latvia since suffering harm. *Id.* at 332 (Sept. 29, 2008 H'rg Tr. at 141). Kruze clarified that she had not returned to Latvia since arriving in the United States ten years ago and that she misunderstood the question. *Id.* Kruze again indicated that she did not need to apply for asylum until she got married. *Id.* at 335 (Sept. 29, 2008 H'rg Tr. at 144).

The IJ issued an opinion on April 7, 2009 denying relief for both Kruze and Zhummaev. *Id.* at 501, 522 (IJ Op. at 1, 22). The IJ found that Kruze "deliberately fabricated" her statement in her application that her brother's actions prevented her from filing within one year of arrival. *Id.* at 513–14 (IJ Op. at 13–14). Accordingly, her asylum claim was time-barred. *Id.* at 514 (IJ

Op. at 14). The IJ further found that Kruze was not credible because "her testimony repudiated the claims made in her application." *Id.* at 515 (IJ Op. at 15). Specifically, the IJ believed that she fabricated the excuse regarding her brother, that she lied about returning to Latvia after experiencing harm, and that she lied in her application about the reasons for the crimes in her apartment. *Id.* at 514 (IJ Op. at 14). The IJ also found her application was frivolous for these reasons. *Id.* at 515 (IJ Op. at 15). Lastly, the IJ stated that Kruze's testimony did not indicate that she had ever experienced persecution on the basis of her heritage or religion and that any fear of future persecution was too speculative. *Id.* at 518–20 (IJ Op. at 18–20). The IJ thus determined that she was not eligible for any form of relief from removal. *Id.*

On March 22, 2011, the BIA issued a separate opinion upholding the IJ's decision. *Id.* at 453 (Mar. 22, 2011 BIA Op. at 1). The BIA did not find it plausible that Kruze misunderstood the question about whether she had returned to Latvia after experiencing harm. *Id.* at 454 (Mar. 22, 2011 BIA Op. at 2). The BIA also rejected Kruze's argument that "even if she deliberately fabricated information on her asylum application, she voluntarily recanted this information at the hearing." *Id.* Finally, the BIA rejected Kruze's argument that her asylum application could not be found frivolous because it was untimely. *Id.* at 454–55 (Mar. 22, 2011 BIA Op. at 2–3).

After obtaining new counsel, Kruze filed a Motion to Reconsider and argued for the first time that her application could not be found frivolous because she was applying only for withholding of removal, not asylum. *Id.* at 434–36 (Resp. Mot. to Reconsider at 4–6). The BIA denied this motion on June 29, 2011, finding that the arguments were not properly raised on a

7

motion to reconsider because they did not address errors in the BIA's earlier ruling. *Id.* at 414–15 (June 29, 2011 BIA Op. at 1–2). In a footnote, the BIA remarked that "the digital recording" of the hearing contradicted Kruze's argument but that a "portion of the hearing d[id] not appear to have been properly transcribed." *Id.* at 415 (June 29, 2011 BIA Op. at 2, n.1).

Kruze petitioned for review of the BIA's decision. *Id.* at 390 (Apr. 4, 2012 6th Cir. Order). We granted the government's unopposed motion to remand so that Kruze's hearing could be re-transcribed and the BIA could issue a new decision after supplemental briefing. *Id.*

On remand, the BIA again dismissed Kruze's appeal. *Id.* at 31 (May 23, 2013 BIA Op. at 1). The BIA noted that the re-transcription was "verbatim to the previous transcription" and concluded the prior transcript was correct. *Id.* at 31–32 (May 23, 2013 BIA Op. at 1–2). The BIA again found Kruze's motion "did not raise a proper basis for reconsideration." *Id*. at 32 (May 23, 2013 BIA Op. at 2). The BIA also dismissed Kruze's argument that her due-process rights were violated because she needed a Latvian translator, finding that the record did not indicate that "her proceedings were fundamentally unfair" and that she herself had stated that there was "[n]o difference" to her as to whether she had a Russian or Latvian translator. *Id.* at 33 (May 23, 2013 BIA Op. at 3). Kruze further argued that she was prejudiced because the interpreter at her hearing translated "asylum" as "political refuge" and that if the specific word "asylum" had been used she would have "corrected her errors." *Id.* The BIA rejected this argument because Kruze failed to demonstrate that she "did not understand the consequences of a frivolous finding." *Id.*

Kruze petitioned for review of the BIA's new decision. *Id.* at 20 (May 16, 2014 6th Cir. Order at 1). Because the "BIA did not address Kruze's arguments that the IJ erred in finding her asylum application frivolous or that she lacked credibility," we granted the government's unopposed motion to remand. *Id.* at 21 (May 16, 2014 6th Cir. Order at 2).

On December 9, 2014, the BIA dismissed Kruze's appeal for the third time. *Id.* at 3 (Dec. 9, 2014 BIA Op. at 1). The BIA found no merit to Kruze's argument that she was not seeking asylum. *Id.* at 3–4 (Dec. 9, 2014 BIA Op. at 1–2). Rather, the BIA found that Kruze's Form I-589 demonstrated that she applied for asylum. *Id.* at 4 (Dec. 9, 2014 BIA Op. at 2). The BIA also cited Kruze's April 7, 2009 hearing during which the IJ stated that he was pretermitting her asylum application as untimely. *Id.* Further, the BIA cited Kruze's own statements at her merits hearing where she told both the IJ and the DHS attorney that she was seeking asylum. *Id.* Finally, the BIA recognized that in Kruze's original appeal to the BIA she conceded that "her asylum application was untimely" and argued that an untimely asylum application could not be found frivolous. *Id.* Accordingly, the BIA held that the record demonstrated that Kruze submitted an asylum application, and it upheld the IJ's findings that Kruze "fabricated material elements of her application," including her reason for filing one year after the deadline and her written statement that someone shot at her apartment because of her heritage. *Id.* at 5 (Dec. 9, 2014 BIA Op. at 3). Kruze has now filed this petition for review.

## II. ANALYSIS

### A. Standard of Review

"Where the BIA reviews the immigration judge's decision and issues a separate opinion, rather than summarily affirming the immigration judge's decision, we review the BIA's decision as the final agency determination." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). "To the extent the BIA adopted the immigration judge's reasoning, however, this Court also reviews the immigration judge's decision." *Id.* Findings of fact are reviewed under the substantial-evidence standard. *Mostafa v. Ashcroft*, 395 F.3d 622, 624 (6th Cir. 2005). Under this standard, findings of fact are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (quoting 8 U.S.C. § 1252(b)(4)(B)). We review all legal determinations de novo. *Khalili*, 557 F.3d at 435.

### B. Merits

Kruze argues that the BIA erred in (1) upholding the IJ's finding of frivolousness; (2) denying her due-process claim; and (3) finding that she failed to establish a likelihood of persecution or torture. We address each argument below.

#### 1. Frivolousness Finding

Kruze argues that the IJ erred in finding that she filed a frivolous asylum application. An asylum application is frivolous "if any of its material elements is deliberately fabricated." *Lazar v. Gonzales*, 500 F.3d 469, 475 (6th Cir. 2007) (quoting 8 C.F.R. § 1208.20). A finding of frivolousness precludes an alien from receiving any benefits under the Immigration and

10

Naturalization Act ("INA"), although it does not preclude withholding of removal. *Id.* (citing 8 U.S.C. § 1158(d)(4) & (6)).

First, Kruze contends that the BIA erred in finding that she submitted a frivolous asylum application because she did not apply for asylum. Rather, she claims that she filed only an application for withholding of removal. Second, Kruze argues that even assuming she did file an application for asylum, the record does not support a finding of frivolousness. A review of the record demonstrates that Kruze submitted an application for asylum and that substantial evidence supports the BIA and IJ's frivolousness finding.

### a. The Record Indicates that Kruze Filed for Asylum

Kruze contends that she did not file an asylum application at all and thus the finding of frivolousness must be reversed. As the BIA found, this argument is contradicted by the record.

At her merits hearing, Kruze assented to the IJ's statement "Okay, ma'am, you submitted an asylum application." A.R. at 217 (Sept. 29, 2008 H'rg Tr. at 26). Kruze argues that she said "Yes" only because the judge was an "authority figure" and asked the question in a leading, declarative manner. Pet'r Br. at 18, 30–31. Kruze also submits an independent translation of the record that indicates that the interpreter translated the word "asylum" to her in Russian as "political refuge." *Id.* at 31–32. She argues that this interpretation does not convey the "legal distinction of asylum and withholding of removal" and thus she did not adequately understand that she was assenting to having applied for asylum rather than withholding of removal. *Id.*

11

This argument is not persuasive. Kruze submitted her Form I-589 with a cover letter, signed by her attorney, entitled "Respondent's Application for Asylum." A.R. at 826 (Form I-589 Cover Letter). In her Form I-589, Kruze provided an explanation for why her application was filed more than one year after arriving in the United States. *Id.* at 835 (Form I-589 at 8). Only asylum claims are subject to this one-year rule. *See* 8 U.S.C. § 1158(a)(2)(B). At her April 3, 2007 hearing, the IJ told Kruze that he was pretermitting her asylum application because he did not believe that her application, on its face, provided a sufficient explanation for missing the one-year deadline. A.R. at 202 (Apr. 3, 2007 H'rg Tr. at 13). The IJ then told Kruze that she would have an opportunity to argue at her merits hearing that her asylum application was timely. *Id.* The record establishes that Kruze did just that: she responded to numerous questions regarding her failure to file within one year of arriving in the United States. *See, e.g.*, *id.* at 251, 253, 257 (Apr. 3, 2007 H'rg Tr. at 60, 62, 66). In her current petition, Kruze acknowledges several times that the IJ pretermitted her asylum application as untimely. *See, e.g.*, Pet'r Br. at 10, 52. That the IJ found her asylum application untimely does not mean that Kruze did not apply for asylum.

Moreover, the IJ specifically warned Kruze that an untimely asylum application may nonetheless be found frivolous. A.R. at 218 (Sept. 29, 2008 H'rg Tr. at 27); *see Ghazali v. Holder*, 585 F.3d 289, 291 (6th Cir. 2009). The IJ also warned Kruze about the consequences of filing a frivolous asylum application, told Kruze that he believed her asylum application may be frivolous, and gave her an opportunity to speak to her lawyer prior to explaining the

inconsistencies in her application.  *See* A.R. at 217–18, 320–21 (Sept. 29, 2008 H'rg Tr. at 26–27, 129–130).  Kruze was represented by counsel throughout her proceeding.  At no time during these colloquies did Kruze or her lawyer indicate that Kruze was not applying for asylum.  Accordingly, we agree with the BIA that the record adequately demonstrates that Kruze applied for asylum.

### b.  The Record Supports the Finding of Frivolousness

Kruze further argues that, even assuming that she did file an application for asylum, the finding of frivolousness is erroneous.  To issue a finding of frivolousness, four conditions must be satisfied:  (1) the IJ must give notice of the consequences; (2) the IJ must specifically find that the applicant knowingly filed a frivolous application; (3) the finding must be supported by sufficient evidence in the record; and (4) the IJ must afford the applicant an opportunity to account for the discrepancies in her application.  *Lazar*, 500 F.3d at 475.  In reviewing a finding of frivolousness, we review factual determinations under the substantial-evidence standard.  *Id.* at 474.

In her petition, Kruze argues that her answer regarding whether she returned to Latvia after she experienced harm was a result of her "misunderstanding" the wording of that question.  Pet'r Br. at 34–35.  She also argues that she reasonably explained in her hearing that she misunderstood the tense of some of her answers, but that she clarified to the IJ that she feared for her present family if they were to be removed to Latvia.  *Id.* at 35.

Kruze's arguments do not support rejecting the BIA's determination. "[O]ne material fabrication is enough to support a finding of frivolousness." *Ceraj v. Mukasey*, 511 F.3d 583, 590 (6th Cir. 2007) (citing 8 C.F.R. § 1208.20). The IJ found that Kruze deliberately lied regarding why she filed for asylum over one year after her arrival. A.R. at 514, 517 (IJ Op. at 14, 17). Kruze provided in her written application that she applied after one year because of her brother's actions. *Id.* at 835 (Form I-589 at 8). But she repeatedly explained during her testimony that she did not need to apply for asylum until she was married, which occurred over one year after her arrival and her brother's alleged actions. *See, e.g.*, *id.* at 257 (Sept. 29, 2008 H'rg Tr. at 66). The IJ warned Kruze of the consequences of filing a frivolous application, listed the portions of her testimony he believed to be fabricated, and provided her with an opportunity to address his concerns. *See id.* at 217–18, 320–21 (Sept. 29, 2008 H'rg Tr. at 26–27, 129–130). Kruze failed to explain these discrepancies and has not offered an explanation on appeal.

Moreover, Kruze also indicated in her application that her house was robbed and shot at because of her "Russian heritage" and her membership in the Russian Orthodox Church. *Id.* at 832 (Form I-589 at 5). But Kruze later testified that the shooting had "nothing to do with nationality" or her religion. *Id.* at 239 (Sept. 29, 2008 H'rg Tr. at 48). Although Kruze explained that she had difficulty with the tense of some of her answers, this does not explain why she connected this past attack to her "Russian heritage" in her written application when she did

not obtain Russian heritage until after her marriage. Accordingly, the frivolousness finding is supported by substantial evidence.[1]

## 2. Due Process

Kruze also argues that her due-process rights were violated because of errors in translation. In order to establish a due-process violation based on erroneous translation, the petitioner "must show error and substantial prejudice." *Gishta v. Gonzales*, 404 F.3d 972, 979 (6th Cir. 2005) (quoting *Larita-Martinez v. INS*, 220 F.3d 1092, 1095 (9th Cir. 2000)). Substantial prejudice is "a demonstration that the alleged violation affected the outcome of the proceedings." *Id.*

First, Kruze argues that her due-process rights were violated because the interpreter at her hearing translated "asylum" as "political refuge." Pet'r Br. at 40. Kruze argues that the generic term "political refuge" does not convey the legal difference between "asylum" and other forms of removal. *Id.* She also states that if the term "asylum" had been translated properly in the IJ's frivolousness warnings she "would have scrutinized her application more closely and corrected" mistakes. *Id.* at 51.

These arguments are not persuasive. Even if the interpreter translated "asylum" as "political refuge," Kruze has not established that this translation resulted in prejudice. As

---

[1]Kruze also argues that the IJ pre-judged her application as frivolous on the basis of a late continuance motion made by Kruze's attorney. Pet'r Br. at 56-57; A.R. at 225 (Sept. 29, 2008 H'rg Tr. at 34). However, as discussed, there is adequate evidence that the IJ's determination of frivolousness was based on the record. Further, the IJ complied with each procedural requirement in stating the basis of his finding and offering Kruze a sufficient opportunity to respond. The record does not support Kruze's argument that the IJ did not consider her claim on the merits.

discussed above, the IJ did not determine that Kruze was filing an asylum application solely because she answered "yes" to his statement. Rather, her own Form I-589 and the entire course of the proceedings reveal that Kruze intended to apply for asylum.[2] Moreover, the record does not support Kruze's argument that she was unable to understand the IJ's warnings of frivolousness because the translator used the term "political refuge." Kruze's Form I-589 includes a warning of frivolousness and Kruze indicated that she reviewed this document with a translator. A.R. at 835 (Form I-589 at 8); *id.* at 218 (Sept. 29, 2008 H'rg Tr. at 27). The IJ engaged Kruze in several colloquies about the meaning and consequences of filing a frivolous application, and Kruze made corrections to her application prior to her testimony. *Id.* at 218–22 (Sept. 29, 2008 H'rg Tr. at 27–31). Further, Kruze was given an opportunity to speak with her lawyer and explain any discrepancies between her testimony and her application. *Id.* at 321 (Sept. 29, 2008 H'rg Tr. at 130). Neither Kruze nor her lawyer expressed confusion over the meaning of a "frivolous" asylum application during her hearings. Moreover, Kruze has not indicated what additional corrections she would have made had the translator used the term "asylum" rather than "political refuge." Accordingly, Kruze has not established a due-process violation arising from the "political refuge" translation.

---

[2]Kruze further maintains that the IJ determined that she was applying for asylum, and thus her due-process rights were violated, based on a statement made by her lawyer—at Zhummaev's hearing for which she was not present—that Zhummaev was a derivative of her asylum claim. Pet'r Br. at 27-30. This argument is not persuasive. As discussed above, there is ample evidence in the record that demonstrates that Kruze applied for asylum and that she included her husband as a derivative. Kruze's own Form I-589 states that her husband is to be included in her application. *See* A.R. at 829 (Form I-589 at 2). The record does not establish that the IJ determined that Kruze was applying for asylum at a hearing in which she was not present. Furthermore, at their combined merits hearing, where Kruze was present with counsel, the IJ stated that "if she would be granted asylum, he would be a derivative." *Id.* at 216 (Sept. 29, 2008 H'rg Tr. at 25). Neither Kruze nor her counsel objected to this statement.

Second, Kruze claims that she gave "non-responsive" answers during her hearing because she needed a Latvian, rather than a Russian, translator.[3] Pet'r Br. at 45. Kruze argues that the IJ was aware of these translation difficulties because she indicated confusion several times. *Id.* at 44. Further, Kruze argues that the lack of a Latvian translator caused her prejudice because her non-responsive answers formed the basis of the IJ's credibility and frivolousness determinations. *Id.* at 48-49.

We disagree. As the government correctly asserts, the IJ's frivolousness and credibility determinations were primarily based on discrepancies between Kruze's written application and her oral testimony, not because she gave "non-responsive" answers in her oral testimony itself. Resp't Br. at 49. Kruze stated in her written application that someone attacked her apartment because of her Russian heritage and religion, but claimed in her testimony that it had "nothing to do with nationality." A.R. at 239 (Sept. 29, 2008 H'rg Tr. at 48). She stated that she filed one year past the deadline because her brother took her things, but said numerous times in her hearing that she needed to apply for asylum only after her marriage. *See, e.g.*, *id.* at 257 (Sept. 29, 2008 H'rg Tr. at 66). None of Kruze's alleged translation problems account for these discrepancies that formed the basis of the IJ's opinion. Thus Kruze cannot establish prejudice. *See Gishta*, 404 F.3d at 979.[4]

---

[3]Kruze claims that when she stated that "Russian be good, also," she was indicating to the IJ that she required a Russian translator *in addition to* a Latvian translator. Pet'r Br. at 46. However, this ignores her later response to the IJ that there was "[n]o difference" to her as to which language she preferred. A.R. at 203 (Apr. 3, 2007 H'rg Tr. at 14).

[4]Kruze argues that "[b]ecause the court was on notice of the interpretation problems the instant case is governed by" our decision in *Amadou v. INS*, 226 F.3d 724 (6th Cir. 2000), and not our decision in *Gishta v.*

### 3. Denial of Withholding of Removal and Protection Under CAT

Lastly, Kruze contends that the BIA erred in finding she was not entitled to withholding of removal or protection under CAT. In order to be entitled to withholding of removal under the INA, an applicant "must show that it is 'more likely than not' that he would be subject to persecution" on the basis of a protected ground. *Shkulaku-Purballori v. Mukasey*, 514 F.3d 499, 503 (6th Cir. 2007) (quoting *Liti v. Gonzales*, 411 F.3d 631, 640–41 (6th Cir. 2005)). To establish withholding of removal under CAT, the applicant must establish that "it is more likely than not that he or she would be tortured" upon removal. *Id.* (quoting 8 C.F.R. § 1208.16(c)(2)). "Persecution must rise above the level of harassment or discrimination without physical punishment, infliction of harm, or significant deprivation of liberty." *Mohammed v. Keisler*, 507 F.3d 369, 371 (6th Cir. 2007). An applicant's "fear of future persecution must be based on reasonably specific information showing a real threat to individual persecution, not mere assertions of fear of possible persecution or speculative conclusions." *Dieng v. Holder*, 698 F.3d 866, 872 (6th Cir. 2012).

The BIA agreed with the IJ that Kruze's "speculation about what might happen to her in Latvia" was insufficient to satisfy either standard. A.R. at 455 (Mar. 22, 2011 BIA Op. at 3).

---

*Gonzales*, 404 F.3d 972 (6th Cir. 2005). Pet'r Br. at 44. We disagree. Even assuming that translation errors existed and that the IJ was on notice, *Gishta* governs. In *Amadou*, we reversed the IJ's denial of relief because the "record indicate[d] that the interpreter's faulty translation likely played a significant part in the judge's credibility determination." *Amadou*, 226 F.3d at 727. In *Gishta*, by contrast, we found that *Amadou* did not apply because Gishta could not establish prejudice. 404 F.3d at 979. "The factors cited by the immigration judge in support of his credibility conclusions d[id] not relate to the translation errors" raised by Gishta on appeal. *Id.* Here, as discussed above, the alleged translation problems cited by Kruze do not account for the discrepancies that formed the basis of the IJ's frivolousness finding. Like Gishta, Kruze cannot establish prejudice, even assuming that translation difficulties existed of which the IJ was aware.

Although the BIA acknowledged "reported instances of discrimination against Russians in Latvia," it recognized that "discrimination alone does not constitute persecution." *Id.* Further, it found that Kruze did not establish that the "police in Latvia would be unwilling or unable to protect her family." *Id.*

Substantial evidence supports the BIA's conclusion that Kruze's testimony does not establish that it is "more likely than not" that she will be subject to persecution or torture. Kruze has not provided any arguments that support overturning the BIA and IJ's findings. In her petition, Kruze states that she "has provided credible evidence which establishes persecution" of Russians in Latvia and that she "has established that the government in Latvia cannot" protect her family. Pet'r Br. at 55–56. But the evidence cited by Kruze—a 2007 State Department Religious Freedom Report for Russia—does not mention the treatment of non-Latvians in Latvia. Pet'r Br. at 55–57; A.R. 814–15, 823–25 (U.S. Dep't of State, Int'l Religious Freedom Report 2007: Russia at 7–8, 16–18). Accordingly, under the substantial-evidence standard, a reasonable adjudicator would not be compelled to reverse the findings of the IJ and the BIA.

### III. CONCLUSION

For the foregoing reasons, we **DENY** Kruze's petition for review.