*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0234p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

MOHAMED SALEM OULD ABDALLAHI,

*Petitioner,*

*v.*

No. 11-3920

ERIC H. HOLDER, JR.,

*Respondent.*

On Petition for Review of a Decision
of the Board of Immigration Appeals.
No. A078-368-600.

Decided and Filed: July 31, 2012

Before: SILER and MOORE, Circuit Judges; VAN TATENHOVE, District Judge.[*]

_____

## COUNSEL

**ON BRIEF:** Dennis M. Clare, LAW OFFICE OF DENNIS M. CLARE, PSC, Louisville, Kentucky, for Petitioner. Claire L. Workman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

_____

## OPINION

_____

SILER, Circuit Judge. Mohamed Salem Ould Abdallahi ("Abdallahi"), a native and citizen of Mauritania, petitions for review of the order of the Board of Immigration Appeals ("BIA") upholding an Immigration Judge's ("IJ") denial of his application to adjust his status under section 245 of the Immigration and Nationality Act, 8 U.S.C. § 1255. For the following reasons, we **DENY THE PETITION FOR REVIEW**.

_____

[*]The Honorable Gregory F. Van Tatenhove, United States District Judge for the Eastern District of Kentucky, sitting by designation.

1

I.

Abdallahi entered the United States lawfully in 2000 as a non-immigrant visitor. He remained longer than permitted and applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"), but those claims were later withdrawn in favor of his request for adjustment of status.

In 2005, Abdallahi received a Notice to Appear ("NTA") stating he was subject to removal under INA § 237(a)(1)(B). Two weeks later, he married a United States citizen who subsequently filed a visa petition for an alien relative ("Form I-130") on Abdallahi's behalf. After the Form I-130 was approved, Abdallahi filed an application for adjustment of status.

In 2007, Abdallahi testified in support of his application at an immigration hearing. At this hearing, IJ Grant questioned Abdallahi about his experience as a gendarme in the Mauritanian military, in which Abdallahi served between 1989 and 1998. He served as a sergeant who oversaw four ranks below him, and his duties included acting as a guard when the military "arrest[ed] the black people." (R. 268, 306). While he stood guard at doors outside interrogations, Abdallahi heard screaming, and he acknowledged that prisoners were tortured during these interrogations. Abdallahi stated that his duties required that he pour cold water on black prisoners, kick them, and ensure that they had no food or toilet access.

Abdallahi witnessed other military members, including those beneath him in command, mistreat prisoners. Specifically, in 1991 or 1992, Abdallahi witnessed two officers place a substance in a prisoner's eyes so that he could not see. (R. 272). One officer told Abdallahi that he had "burned that guy" and that "they [were] going to make him talk." (R. 273-74). This officer was "a member of the gendarmerie fourth grade," a grade directly below Abdallahi. (R. 274).

In 1996, Abdallahi stood guard over black prisoners while other soldiers kicked and beat the prisoners until they bled. Abdallahi left his post for a break and returned to find some prisoners missing "because [the military] [couldn't] let them go into the

street with that mark, torture mark on." (R. 280). Also in 1996, he apprehended black student demonstrators and brought the students to interrogations where he heard screams and "[d]efinitely" knew that "something bad" was happening to the students. (R. 311-12).

Abdallahi stated that he could not stop the acts of the officers, even though he thought the acts were "against [] humanity," because he feared they would "put [him] in the same position with the guy who g[o]t tortured." (R. 275-76). Because Abdallahi was regarded as a black African by his colleagues, he believed that the gendarmes would view him as supporting the transfer of the military's power "to the black people" if he were to protest. (R. 277). Abdallahi testified that he did not report the mistreatment of prisoners to higher military authorities because he believed that those authorities supported the treatment.

Abdallahi decided to leave Mauritania when his cousin disappeared. Abdallahi believed that the Mauritanian government assumed that he supported an opposition candidate, because Abdallahi and the candidate were of the same tribe, and he believed that the government would "eliminate" him. (R. 317).

At the conclusion of the hearing, Abdallahi withdrew his asylum, withholding of removal, and CAT application. Accordingly, IJ Grant dismissed the application with prejudice. IJ Grant then requested additional documents and summation statements from both parties as to Abdallahi's statutory eligibility for adjustment of status.

Before issuing a decision in Abdallahi's case, IJ Grant left the Immigration Court, and the case was transferred to IJ O'Leary. Abdallahi objected to the transfer and requested a new hearing before IJ O'Leary. Abdallahi argued that because IJ O'Leary had not personally heard his testimony, his due process rights would be violated if IJ O'Leary were to render a decision. IJ O'Leary overruled the objection, stating he sufficiently familiarized himself with the record.

In 2007, IJ O'Leary issued a written decision finding Abdallahi inadmissible to the United States, pursuant to Section 212(a)(3)(E)(iii) of the INA, for having

"committed, ordered, incited, assisted, or otherwise participated in the commission of . . . any act of torture," as found in 8 U.S.C. § 1182(a)(3)(E)(iii), and therefore ineligible to adjust his status.

The BIA affirmed the IJ's findings, reasoning that IJ O'Leary (1) reviewed the hearing record in accordance with 8 C.F.R. § 1240.1(b), and his decision reflected his complete review of the record; (2) there were no erroneous findings of fact relating to the central holding of the IJ, that Abdallahi participated in acts of torture while a sergeant in the Mauritanian army in 1996; (3) Abdallahi failed to demonstrate that he suffered prejudice and to provide sufficient reason to hold an additional hearing; (4) the evidence admitted for impeachment purposes only "was not important to the decision" (R. 32-34); and (5) Abdallahi was provided a fair hearing. Further, the BIA found that Abdallahi acted voluntarily and that clear evidence indicated a direct connection between Abdallahi and the torture committed.

## II.

We review only the decision of the BIA. *See Anssari-Gharachedaghy v. INS*, 246 F.3d 512, 513 (6th Cir. 2000). But where the BIA summarily adopts the IJ's decision and also provides commentary of its own, we review both the BIA's decision and the IJ's decision. *Gilaj v. Gonzales*, 408 F.3d 275, 282-83 (6th Cir. 2005) (per curiam). We review the BIA's legal conclusions de novo, including whether or not petitioner has proven a due process claim, *Hassan v. Holder*, 604 F.3d 915, 923 (citation omitted), and we defer to the BIA's "reasonable interpretations of the INA." *Patel v. Gonzales*, 432 F.3d 685, 692 (6th Cir. 2005).

For final orders of removal, this court reviews factual findings, including credibility determinations, under a substantial evidence standard "in which [this court] uphold[s] a BIA determination as long as it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Parlak v. Holder*, 578 F.3d 457, 462 (6th Cir. 2009) (citation and internal quotation marks omitted). "[U]nless any reasonable adjudicator would be compelled to conclude the contrary," the BIA's findings

of fact are conclusive under this standard. *Koulibaly v. Mukasey*, 541 F.3d 613, 619 (6th Cir. 2008) (quoting 8 U.S.C. § 1252(b)(4)(B)).

III.

The BIA found that Abdallahi demonstrated no prejudice and provided insufficient reasons to hold an additional hearing before IJ O'Leary. The Fifth Amendment's protections extend to Abdallahi, who is entitled to a full and fair hearing at his immigration proceeding. *Vasha v. Gonzales*, 410 F.3d 863, 872 (6th Cir. 2005). To evaluate whether fundamental fairness was denied, we ask whether there was a defect in the removal proceeding, and if so, whether Abdallahi was prejudiced by the defect. *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 679 (6th Cir. 2005). Thus, proof of prejudice is necessary to establish a due process violation. *Id.* In order to establish the requisite prejudice, Abdallahi "must show that the due process violations led to a substantially different outcome from that which would have occurred in the absence of these violations." *Garza-Moreno v. Gonzales*, 489 F.3d 239, 241-42 (6th Cir. 2007).

A.

Here, Abdallahi alleges this defect in his process: IJ O'Leary's denial of his request for a new hearing after IJ Grant, who presided over his removal hearing, left the court. Abdallahi argues that his right to present evidence on his own behalf, pursuant to 8 U.S.C. § 1229A; 8 C.F.R. § 1240, was violated. As a result, he alleges, the BIA did not consider whether the administrative procedures accorded to Abdallahi were constitutionally sufficient. He argues that the BIA did not properly consider factors set out in *Mathews v. Eldridge*, 424 U.S. 319 (1976), to test the constitutional adequacy of the procedure afforded to Abdallahi.[1]

The Attorney General ("AG") argues that Abdallahi had no liberty interest to be protected because his due process claim arises solely from the denial of the discretionary

---

[1] Those factors include: (1) individual interests at stake; (2) risk of error through the procedures used and probable value, if any, of additional or substitute procedural safeguards; (3) costs and administrative burden of the additional process, and (4) the interests of the government in efficient adjudication. *See Mathews*, 424 U.S. at 335.

relief of adjustment of status, suggesting that Abdallahi's due process argument is moot. However, the AG conflates "discretionary status" with "discretionary relief." While it is true that "the failure to be granted discretionary relief . . . does not amount to a deprivation of liberty interest," *Patel v. Gonzales*, 470 F.3d 216, 220 (6th Cir. 2006), we have also held that the Fifth Amendment's Due Process Clause mandates that removal hearings be fundamentally fair and that a petitioner is entitled to a full and fair hearing. *Martini v. Mukasey*, 314 F. App'x 819, 823 (6th Cir. 2008). The case law cited by the AG may be distinguished from Abdallahi's case, because Abdallahi alleges a due process violation with respect to his opportunity for a full and fair hearing.

Abdallahi's due process argument focuses on the fact that the IJ who heard his testimony did not decide his case. However, the Federal Regulations specifically provide for proper procedure in a situation like Abdallahi's. 8 C.F.R § 1240.1(b) provides that:

> The immigration judge assigned to conduct the hearing shall at any time withdraw if he or she deems himself or herself disqualified. If an immigration judge becomes unavailable to complete his or her duties, another immigration judge may be assigned to the case. The new immigration judge shall familiarize himself or herself with the record in the case and shall state for the record that he or she has done so.

8 C.F.R § 1240.1(b). Although IJ Grant personally heard Abdallahi's testimony in 2007, he left the court before issuing a decision in the case. Accordingly, he was "unavailable" within the meaning of section 1240.1(b). Therefore, the fact that IJ O'Leary was substituted for IJ Grant was not in violation of section 1240.1(b).

Furthermore, in IJ O'Leary's decision, he stated, in compliance with his assignment of Abdallahi's case pursuant to 8 C.F.R. § 1240.1(b), that he had reviewed the entire record, including the recorded testimony of Abdallahi and his wife. (R. 205). Also, he stated in an interim order that he familiarized himself with the record of proceedings. (R. 205). Thus, IJ O'Leary satisfied the requirements of the Federal Regulations. *Cf. Sequiera v. U.S. Attorney General*, No. 07-11660, 2007 U.S. App. LEXIS 25253 (11th Cir. Oct, 26, 2007) (applicant for adjustment of status under the

Nicaraguan Adjustment and Central American Relief Act of 1997 established no due process claim because the record showed that the applicant was afforded a full and fair opportunity to present evidence and to testify pursuant to the requirements of 8 C.F.R. § 1240.1(c) and 8 U.S.C. § 1229a(b)(1)).  Because IJ O'Leary satisfied the procedure dictated in the applicable Federal Regulations, the procedural error prong of this due process challenge is not satisfied.

B.

In addition, Abdallahi alleges that he was prejudiced because IJ O'Leary took over his case from IJ Grant.  Abdallahi argues that because IJ O'Leary was not privy to in-person testimony provided at the hearing over which IJ Grant presided, his right to a full and fair hearing was violated,  thus rendering his hearing a nullity.  Abdallahi supports his proposition by pointing out factual errors in IJ O'Leary's written decision.  Abdallahi also alleges that IJ O'Leary did not conduct a "proper review" of the record and, as such, "misunderstood" Abdallahi's testimony.

We have already established that it was not procedural error for IJ O'Leary to render a decision in this case.  Further, while "[i]t is undisputed that petitioners in [removal] proceedings are entitled to an unbiased arbiter who has not prejudged their claims," *Ahmed v. Gonzales*, 398 F.3d 722, 725 (6th Cir. 2005), the record does not suggest that the second immigration judge, IJ O'Leary, approached this case with a closed mind or a partisan position.  The record does not support a finding that IJ O'Leary was not neutral.[2]  Abdallahi's arguments alleging bias and prejudice appear to be, in fact, challenges to IJ O'Leary's determination.  IJ O'Leary gave due weight and consideration to the hearing testimony.  Abdallahi establishes neither error nor substantial prejudice and therefore cannot prevail on a due process challenge to deportation proceedings.

---

[2]"A *neutral* judge is one of the most basic due process protections." *Rranxburgaj v. Mukasey*, 286 F. App'x 268, 272 (6th Cir. 2008) (quoting *Reyes-Melendez v. INS*, 342 F.3d 1001, 1006 (9th Cir. 2003)) (internal quotation omitted).

IV.

The BIA sustained the IJ's factual findings and regarded factual errors in IJ O'Leary's written decision inconsequential to the court's determination that Abdallahi is inadmissible. Abdallahi believes that the BIA erred and disputes IJ O'Leary's characterization of his testimony, arguing that his testimony shows he never intended to assist in the torture of prisoners.

To the extent that Abdallahi disagrees with IJ O'Leary's findings of fact, those findings can be reversed only when the record compels it. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1, 483-84 (1992). While the BIA admits IJ O'Leary made errors regarding other facts, the BIA found that those facts are immaterial, and the record supports this finding. *See Parlak*, 578 F.3d at 467-68 (upholding the BIA's finding that, even excluding the potentially problematic documents upon which the immigration judge had relied, "there was still sufficient evidence to support the [judge]'s factual findings on the other issues that form the basis for the affirmance"); *Ramaj v. Gonzales*, 466 F.3d 520, 531 (6th Cir. 2006) (finding that substantial evidence supported the agent's independently dispositive reason for denying asylum, such that "any errors by the [Immigration Judge] on the issues of Ramaj's credibility and his Exhibit 8 documents [we]re harmless").

Review of the record wholly affirms IJ O'Leary's understanding of Abdallahi's testimony, and the alternative description proffered by Abdallahi has no basis in the record. Abdallahi's acts in the Mauritanian military fall squarely within the INA's provision prohibiting admittance where the alien has "committed, ordered, incited, assisted, or otherwise participated in the commission of any act of torture . . . ." 8 U.S.C. 1182(a)(3)(E)(iii). We review factual findings under a substantial evidence standard, and we affirm the BIA determination because it is supported by reasonable, substantial and probative evidence found in Abdallahi's own testimony. The BIA reasonably concluded that the record supported IJ O'Leary's finding that Abdallahi is inadmissible for assisting in torture.

V.

The BIA found that Abdallahi was ineligible to adjust status because he participated in acts of torture while a sergeant in the Mauritanian military. Abdallahi challenges the BIA's finding, as a matter of law, that Abdallahi committed acts which qualify as assistance in the torture of others under 8 U.S.C. § 1182(a)(3)(E)(iii).[3] This court defers to the BIA's "reasonable interpretations of the INA." *Patel v. Gonzales*, 432 F.3d 685, 692 (6th Cir. 2005). The BIA and the IJ found that Abdallahi assisted in torture, which dispositively rendered him inadmissible. Thus, there is no need to address whether Abdallahi "*participated* in the commission of any act of torture." 8 U.S.C. § 1182(a)(3)(E)(iii) (emphasis added).

Moreover, Abdallahi argues that the BIA failed to distinguish between genuine assistance in torture and inconsequential association with torturers, as articulated in *Fedorenko v. United States*, 449 U.S. 490 (1981), in determining when an individual assists in persecution.[4] In *Fedorenko*, the Supreme Court determined that a

---

[3]The applicable definition of torture is located at 18 U.S.C. § 2340, and "torture" is defined as follows:

(1) "torture" means an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control;

(2) "severe mental pain or suffering" means the prolonged mental harm caused by or resulting from--

    (A) the intentional infliction or threatened infliction of severe physical pain or suffering;

    (B) the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

    (C) the threat of imminent death; or

    (D) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality; . . . .

18 U.S.C. § 2340(1)-(2).

[4]This case cited by Abdallahi, and discussed by the AG, specifically addresses the crime of persecution. The language of the persecution statute closely parallels Section 212(a)(3)(E)(iii), and this line of cases has been used to analyze inadmissibility as it applies to acts of torture, rather than persecution. *See Miranda Alvarado v. Gonzales*, 449 F.3d 915 (9th Cir. 2006) (court held that an asylum applicant's role as an interpreter in police interrogations in which detainees were tortured constituted assistance in persecution, inasmuch as his role was integral to the persecution of protected individuals). The BIA analyzed Abdallahi's conduct under this framework established in *Fedorenko* and its progeny. *Compare* 8 U.S.C. § 1182(a)(3)(E)(iii) *with* 8 U.S.C. § 1158(b)(2)(A)(i).

concentration camp guard who shot at escaping inmates based on orders had "assisted in the persecution of civilians." 449 U.S. at 512 n. 34.  In a footnote, the court provided:

> [A]n individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians. On the other hand, there can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates on orders from the commandment of the camp, fits within the statutory language about persons who assisted in the persecution of civilians. Other cases may present more difficult line-drawing problems but we need decide only this case.

*Id.*  In 2009, the Supreme Court held that we are not necessarily bound by *Fedorenko*'s analysis because the INA has a different structure and purpose than the Displaced Persons Act of 1948, the statute applied in *Fedorenko*.  *Negusie v. Holder*, 129 S. Ct. 1159, 1165 (2009).[5]

Because the INA has a different structure and purpose than the statute at issue in *Fedorenko*, and in light of the *Negusie* decision, the *Fedorenko* analysis of what constitutes "assisting in" persecution, or torture has been modified.  In *Diaz-Zanatta v. Holder*, 558 F.3d 450 (6th Cir. 2009), we adopted an analysis which requires: (1) that there be some nexus between the alien's actions and the persecution of others, such that the alien can fairly be characterized as having actually assisted or otherwise participated in that persecution; (2) if such a nexus is shown, the alien must have acted with scienter; the alien must have had some level of contemporaneous knowledge that the persecution was being conducted. *Id*. at 455.[6]

---

[5] *Negusie*'s holding, however, does not prevent all analogizing between *Fedorenko* and INA cases.  *See Parlak*, 578 F.3d 457 (petitioner found ineligible for withholding of removal based on substantial evidence, even without the disputed documents, which showed that he assisted in the persecution of others by providing funding for, and transporting weapons used by, the Kurdistan Workers Party).

[6] These hurdles are generally accepted among other circuits.  *See, e.g., Chen v. U.S. Attorney General*, 513 F.3d 1255, 1259 (11th Cir. 2008) (inquiry is "whether the applicant's personal conduct was merely indirect, peripheral and inconsequential association or was active, direct and integral"); *Gao v. United States Attorney General*, 500 F.3d 93, 99 (2d Cir. 2007) (adopting knowledge requirement); *Castaneda-Castillo v. Gonzales*, 488 F.3d 17 (1st Cir. 2007) (en banc) (establishing the knowledge, or scienter, requirement); *Xie v. INS*, 434 F.3d 136, 143 (2d Cir. 2006) (requiring nexus "where the [alien's]

The petitioner in *Diaz-Zanatta* collected intelligence information and provided that information to her supervisors in the Peruvian military. *Id*. at 458-59. The petitioner participated in traditional, legitimate activities, we found, and was not a part of an element of the Peruvian military which participated in persecution. *Id*. The petitioner did not testify that any of the individuals she investigated were persecuted. *Id*. at 459. Unlike the petitioner in *Diaz-Zanatta*, Abdallahi did testify that he picked up student protesters who were then tortured. Abdallahi brought prisoners to interrogation rooms, where they were tortured, and outside which he stood guard. Unlike in *Diaz-Zanatta*, the AG here was able to show conclusively an actual connection between Abdallahi's activities and the torture of others. The IJ pointed to this evidence, which the BIA affirmed.

Furthermore, Abdallahi testified that he had some level of prior or contemporaneous knowledge that the acts of pouring water on prisoners, or bringing prisoners to interrogation rooms, was in an effort to further their torture. Abdallahi did not simply suspect that torture was being committed; he knew. He heard the screams of prisoners; he participated in pouring water on prisoners himself. He even testified that he knew the acts were wrong. Abdallahi had prior knowledge of an intent to torture the prisoners. *Cf. id.* at 460.

Abdallahi urges this court to find that the BIA erred by not finding his actions involuntary and by not determining the voluntariness of his actions, such that *Negusie* might apply to his case. *See Negusie*, 555 U.S. 511 (Court held that the "persecutor bar" does not prohibit granting asylum to a refugee who is compelled against his will by credible threats of death or torture to assist or participate in acts of persecution; the voluntariness of an individual's actions is relevant to the question of whether the persecutor bar should apply). However, *Negusie* does not benefit Abdallahi because he acted voluntarily as a gendarme in the Mauritanian military. In *Negusie*, the petitioner was conscripted for service in the military. *Id.* at 514. He refused to go to the front, and

---

conduct was active and had direct consequences for the victims"); *Singh v. Gonzales*, 417 F.3d 736 (7th Cir. 2005) (nexus requirement).

he was placed in a prison in which some prisoners were mistreated because of their religious beliefs. *Id.* at 515. He eventually became a guard at a prison, was not allowed to leave, and refused orders to punish prisoners. *Id.* at 515, 540.

Abdallahi admits in testimony that he chose to join the military and that he stayed in the job for pay. Abdallahi admits on the record that he was free to leave on a break (subsequent to arresting student protestors who were then tortured) and yet he chose to return to the job. Abdallahi also admits on the record that it was in fact his "fear" of being treated like prisoners that kept him from leaving. He experienced no physical coercion forcing him to assist with the acts of torture. When Abdallahi was arrested by his employer it was for failure to show his participation in voting for a certain political candidate, unrelated to any refusal to assist with torture. Clearly, the facts of Abdallahi's assistance do not parallel the facts in *Negusie*.

The IJ opinion found Abdallahi had prior or contemporaneous knowledge of such torture. Likewise, the BIA opinion specifically stated that Abdallahi had "the requisite knowledge that the torture was to occur or was occurring," citing to *Diaz-Zanatta* as legal precedent. (R. 33). Because the BIA did not err in its legal analysis and because its determination that Abdallahi assisted in the torture of others was supported by substantial evidence, we affirm the BIA's determination that Abdallahi is inadmissible and ineligible to adjust his status.

**PETITION FOR REVIEW DENIED.**