NOT RECOMMENDED FOR PUBLICATION
File Name: 13a0099n.06

No. 12-3594

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
*Jan 29, 2013*
DEBORAH S. HUNT, Clerk

SIMON HARUTYUNYAN and ARMINE )
HARUTYUNYAN, )
 )
    Petitioners, )    ON PETITION FOR REVIEW OF
 )    THE DECISION OF THE BOARD
v. )    OF IMMIGRATION APPEALS
 )
ERIC H. HOLDER, JR., Attorney General of the )
United States, )
 )    OPINION
    Respondent. )
 )

Before:  NORRIS, MOORE, and DONALD, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.**  Simon and Armine Harutyunyan are asylum applicants from Armenia, positing that they seek refuge from political persecution latent within the country.  In their petition for review, they claim that the immigration judge's adverse credibility findings were not supported by substantial evidence and that they were deprived of due process and an impartial arbiter.  We disagree, and **DENY** the petition accordingly.

I.

Simon and Armine Harutyunyan are a married couple from Armenia.[1]  Before coming to the United States, Simon ran a family café, handling the day-to-day affairs of the business.  In 2005, Simon was asked by a friend if he could distribute promotional materials for the National Unity

---

[1] Both the lead and derivative applicants are parties before this Court.  Accordingly, for ease of reference, the parties are referred to by their given names throughout this opinion.

Party, an Armenian opposition group, to party members. Simon agreed. He later acquiesced to placing the materials in his café for patron consumption. While the café's walls and windows were adorned with party paraphernalia, Simon himself was not a party member. He was, however, sympathetic to the party's beliefs.

On March 4, 2006, several policemen entered the café while patrons were engaged in political discussion. Simon was asked to show documents pertaining to the operation of his business. He complied, but was nevertheless arrested. Three others, including Simon's friend, were also arrested.

Simon was detained for six days at police headquarters. During their interrogation, the police demanded that Simon sign a written confession admitting to planning a coup against the government. When he refused, Simon was escorted to a small room which he described as an "isolation room." Left undisturbed overnight, the police took Simon to a basement room the next morning; upon arrival, two men in civilian attire began verbally assaulting him. The men sat Simon down on a chair, kicked a chair leg and detached it, beating a fallen Simon with the leg while yelling at him. Simon lost consciousness but regained it, finding himself returned to the isolation room. After several hours, Simon was returned to the basement where the two men repeated the physical abuse. While doing so, they threatened to kill Simon if he failed to confess in writing that he was planning a coup. The threats and beatings continued until March 10, 2006, when Simon's father paid $6,000 to obtain his son's release.

Before Simon departed the station, the police allegedly warned him that they would "find a way and a reason" and that they would kill him. Upon returning home, a physician neighbor treated

Simon's wounds and gave him pain medication. When his condition deteriorated, Simon went to a hospital; the hospital found him to be in "grave condition" and observed that Simon had broken teeth, a broken jaw, kidney damage, cuts over his eyebrow, blood in his urine, and pain all throughout his body. Two days later, after a recovery "without complications," Simon was discharged in "satisfactory condition."

Despite advice from the head of the National Unity Party that little could be done about the situation, Simon signed a complaint letter drafted by his friend to send to the Ministry of Justice. The ministry issued no response.

On April 11, 2006, the police visited the family café. Simon's father explained to them that Simon was not present but was nearby and would be returning to the café shortly. The father then contacted his son, advising him to leave the vicinity. Simon retreated to the home of his in-laws. When the police were unable to apprehend Simon at the café or his home, they arrested his father and detained him for three days. The Harutyunyans report that, since their departure from Armenia, their family has been subject to continued harassment by police officials demanding to know Simon's location.

In May 2006, the Harutyunyans entered the United States on visitor visas. Having overstayed their visas, the Harutyunyans, with Simon as the lead applicant, filed an application for asylum on March 19, 2007. He sought asylum primarily on political grounds, particularly with respect to his sympathies and ties to the National Unity Party. In support of their application, the Harutyunyans included a letter from Simon's father attesting to Simon's past plight and potential peril. Simon's father has since died.

An asylum officer conducted an interview to consider their application. The Department of Homeland Security then referred the application to an immigration judge (IJ) for consideration and issued a Notice to Appear for removal proceedings.

After conducting two days of hearings, the IJ issued a decision denying Simon's application for asylum, withholding of removal, and protection under the Convention Against Torture. The IJ made an adverse credibility determination as to Simon, positing that inconsistencies in the Harutyunyans' respective testimonies, combined with material omissions, made Simon an incredible witness. To wit, the IJ cited the following in support of his determination: (1) an omission from Simon's I-589 declaration regarding the death threats he encountered while detained; (2) the implausibility of sending a complaint letter in spite of the threat of retaliation; (3) Simon's failure to retain a copy of the letter; (4) an inconsistency as to the date on which Simon's father became aware of his son's arrest; and (5) an omission regarding the police's questioning of Armine.

The Board of Immigration Appeals (BIA) reversed and remanded the IJ's decision in a single-judge order, ordering the IJ to consider the corroborative evidence the Harutyunyans submitted in support of their asylum claim. On remand, the IJ further explained that the letter from Simon's father had limited probative and persuasive value, as it was drafted after the Harutyunyans arrived in the United States and were preparing their application for asylum. The IJ also addressed a medical report concerning the extent of Simon's injuries, his subsequent treatment, and his release; the IJ observed that a two-day recovery and discharge after being in "grave condition" was likely implausible. The IJ noted the absence of any mention of the medical record in Simon's application, finding the omission to be supportive of an adverse credibility determination. The BIA affirmed the

IJ's decision in a single-judge order, finding no clear error as to the IJ's adverse credibility

determination and finding "no indication in the record" that the IJ was not a neutral decisionmaker.

The Harutyunyans timely filed a petition for review.

II.

"This court has jurisdiction to review the final decision of the BIA 'affirming the IJ's denial

of asylum.'" *Hachem v. Holder*, 656 F.3d 430, 434 (6th Cir. 2011) (quoting *Singh v. Ashcroft*, 398

F.3d 396, 400 (6th Cir. 2005)). We review *de novo* any legal determinations and review the BIA's

decision to determine whether any factual findings are supported by substantial evidence. *Mostafa

v. Ashcroft*, 395 F.3d 622, 624 (6th Cir. 2005). Under this deferential substantial-evidence standard,

"we will not reverse a factual determination unless we find 'that the evidence not only supports a

contrary conclusion, but *compels* it.'" *Bonilla-Morales v. Holder*, 607 F.3d 1132, 1136 (6th Cir.

2010) (quoting *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004)). "Where the Board adopts the

IJ's decision and supplements that decision with its own comments, as in this case, we review both

the BIA's and the IJ's opinions." *Hachem*, 656 F.3d at 434 (citing *Gilaj v. Gonzales*, 408 F.3d 275,

283 (6th Cir. 2005) (per curiam)).

In their petition for review, the Harutyunyans challenge the IJ's adverse credibility findings.

The REAL ID Act of 2005 governs our review of their claims.[2] The Act requires that credibility

---

[2] The Harutyunyans ask us to conduct our review under the pre-REAL ID Act standard as applied in *Koulibaly v. Mukasey*, 541 F.3d 613 (6th Cir. 2008), despite the fact that they filed their application after the Act took effect. While they "respectfully submit that the rationale of *Koulibaly* should be extended to this case," they offer no valid basis for doing so. Accordingly, we conduct the "stricter review provided by the REAL ID Act." *See El-Moussa v. Holder*, 569 F.3d 250, 256 (6th Cir. 2009).

determinations be made under the "totality of the circumstances," permitting an IJ to take into account "all relevant factors," including:

> the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.

8 U.S.C. § 1158(b)(1)(B)(iii) (2006). "We review separately each of the . . . inconsistencies upon which the IJ and BIA based the adverse credibility determination" to see if the agency's findings are supported by substantial evidence. *Abdurakhmanov v. Holder*, 666 F.3d 978, 982 (6th Cir. 2012).

Four primary inconsistencies and implausibilities in the record led to the BIA's affirmance of the IJ's adverse credibility determination. The most serious of these concerns the nature and severity of Simon's injuries. Two other related inconsistencies and implausibilities touched upon (1) the threats Simon encountered while incarcerated; and (2) Simon's decision to write a complaint letter after his detention.[3] The other ancillary concern supporting an adverse credibility determination was one regarding Armine's questioning by police about her husband's location.

The IJ doubted the consistency of Simon's testimony and the corroborative evidence concerning the extent of his injuries. While a medical report detailed the extent of Simon's injuries

___

[3] The Harutyunyans do not appear to challenge this particular observation under the substantial evidence standard. Instead, concerns about the complaint letter appear to be incorporated into their bias claim. Hence, this implausibility will be discussed in Part III below.

and described his condition as "grave," the IJ expressed skepticism about Simon's "remarkable recovery [which] occurred in 2 days, following [Simon's] alleged admittance for treatment of severe injuries arising out of 'the massacre.'" Further compounding the IJ's doubts regarding the medical corroborative evidence was the fact that Simon "made no mention of a period of hospitalization, 2 days or otherwise, for treatment following his alleged period in custody" in his application for asylum.

The IJ's doubts and the resulting adverse credibility determination are supported by substantial evidence. Simon failed to mention any period of hospitalization in his application for asylum; additionally, the only mention of injury in his application is the "very sharp pains in [his] back and in [his] body" that he suffered after his period of detention. During Simon's asylum hearing, his ability to recollect the extent of injuries dramatically improved: his description went from the "very sharp pains" throughout his body he claimed during the application process to a "terrible pain in . . . [his] kidneys," several loose teeth, a bleeding jaw, "terrible headaches," pain in his urinary tract, and an inability to stand or walk. As the IJ observed, the full extent of these injuries, Simon's hospitalization, and his treatment were conspicuously absent from the initial application. Such omission and disparity between the I-589 disclosures and an applicant's testimony can support an IJ's adverse credibility determination. *See Khozhaynova v. Holder*, 641 F.3d 187, 194 (6th Cir. 2011) (concluding that inconsistencies between a petitioner's application and testimony can support an adverse credibility determination). And it does so here.

Similarly absent from Simon's I-589 declaration is any mention of the death threats that he received while detained, up until the point of his release. In his testimony, Simon claimed that the

police were "threatening to kill [him]." He explained that the police threatened him in an effort to coerce him to sign a writing that confessed to planning a coup in Armenia. Upon his release, the police told Simon that "they would kill [him], they would find a way and a reason and they would kill [him]." None of these threats were included in Simon's I-589 application or supporting documentation. When asked about the conspicuous absence of the multitude of threats Simon encountered, he apologized and stated: "I didn't write as many details, I suppose, as you'd like." Relatedly, a letter from Simon's father, now deceased, also "certified" that "Simon's coming to Armenia is very dangerous both for Simon and his family."

There is no expectation that an application will contain every detail and every minute aspect of an applicant's request for asylum. *See Kaba v. Mukasey*, 546 F.3d 741, 749 (6th Cir. 2008). "On the other hand, an application should contain at least some indication of the type of assertions that will be made in support of a claim." *Id.* at 749-50. Like the omission about the extent of Simon's injuries, no such indication was provided for the death threats by the Armenian police. The letter from Simon's father, while deemed credible, had little probative value; it summarily discusses Simon's detention, provides no specific evidence as to what happened during his incarceration, and cryptically warns of danger in Armenia. Such a document barely supports, let alone compels, a conclusion contrary to the one developed by the IJ.

In concluding our substantial evidence review, we address the inconsistency arising from Armine's visit to her father-in-law and her questioning by police as to Simon's whereabouts. The Harutyunyans claim that the IJ had no basis for finding an inconsistency regarding when Simon's father learned about his son's detention. This was not, however, the inconsistency upon which the

BIA relied; hence, we decline to review this assertion. *See Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) ("Longstanding principles concerning judicial review of administrative action require that we assess the administrative agency's decision 'solely by the grounds invoked by the agency.'" (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)); *cf. Thapa v. Holder*, 475 F. App'x 593, 594-95 (6th Cir. 2012) (declining to address an issue that was unaddressed by the BIA when the BIA's denial of asylum could be upheld "on other grounds that are supported by the record"). Instead, we address the BIA's reliance on Simon's omission of Armine's police questioning from his I-589 declaration. The Harutyunyans contend that this omission was *de minimis*. To the contrary, the questioning of family members can be material to a persecution claim, and its omission here validly constituted support for an adverse credibility determination. *See Ileana v. INS,* 106 F. App'x 349, 350, 352 (6th Cir. 2004) (citing a Romanian official's questioning of an applicant's mother as part of a factual basis for finding persecution). In any event, the REAL ID Act makes the materiality of an inconsistency immaterial; thus, even if the omission was *de minimis*, it may still support the IJ's adverse credibility finding. *See* 8 U.S.C. § 1158(b)(1)(B)(iii).

Without the requisite showing of credibility, the Harutyunyans "cannot establish that [they are] entitled to asylum or withholding of removal." *See Pak v. Holder*, No. 12-3267, 2012 WL 6700330, at *2 (6th Cir. Dec. 27, 2012) (citing *Zhao v. Holder*, 569 F.3d 238, 249 (6th Cir. 2009); *Singh v. Ashcroft*, 398 F.3d 396, 404 (6th Cir. 2005)). Hence, we cannot grant their petition for review on this basis.

III.

We now turn to the Harutyunyans' bias claim. They allege that "[t]he analysis of the BIA/IJ upon remand and in the initial opinion reveal bias against the Petitioners," quoting one question-and-answer segment from the cross-examination of Simon concerning his decision to sign a complaint letter to the Ministry of Justice. There is nothing in the record to suggest that the IJ did not "function as a neutral, impartial arbiter and [failed to] refrain from taking on the role of advocate for either party." *See Elias v. Gonzales*, 490 F.3d 444, 451 (6th Cir. 2007). Nor do the Harutyunyans attempt to assert this; their arguments "alleging bias and prejudice appear to be, in fact, challenges to [the IJ's] determination." *See Abdallahi v. Holder*, 690 F.3d 467, 474 (6th Cir. 2012) (evaluating a bias claim in an immigration case where the petitioner supported his due process argument by "pointing out factual errors" in the IJ's written decision). To the extent that the Harutyunyans' "bias" claim is one challenging the IJ's findings, we see no reasoned argument based on the record or legal authority that would support such a claim; therefore, with this issue "adverted to in a perfunctory manner [and] unaccompanied by some effort at developed argumentation," we deem it waived. *See Dugboe v. Holder*, 644 F.3d 462, 470 (6th Cir. 2011) (internal quotation marks omitted). To the extent that the claim is one of bias, we discern neither error nor prejudice that would allow the Harutyunyans to prevail on their bias-based due process challenge. *See Abdallahi*, 690 F.3d at 474.

IV.

The Harutyunyans also assert that the BIA denied them due process by failing to have a three-judge panel adjudicate their appeal once the IJ rendered his second decision. They argue that the BIA's failure to assign either a three-judge panel or the single member who initially reviewed and

remanded the IJ's first decision constitutes a deprivation of due process. In support of their claim,

the Harutyunyans rely upon the Fourth Circuit's decision in *Quinteros-Mendoza v. Holder*, 556 F.3d

159 (4th Cir. 2009), in addition to the agency's own regulations as promulgated in Title 8, section

1003.1(e) of the Code of Federal Regulations.

"It is an elemental principle of administrative law that agencies are bound to follow their own

regulations." *Billeke-Tolosa v. Ashcroft*, 385 F.3d 708, 711 (6th Cir. 2004) (quoting *Wilson v.

Comm'r of Soc. Security*, 378 F.3d 541, 545 (6th Cir. 2004)) (modification in original removed).

Under its enabling rules, the Board has the discretion to convene a three-member panel if a case

presents one of the following circumstances:

> (i) The need to settle inconsistencies among the rulings of different immigration judges;
>
> (ii) The need to establish a precedent construing the meaning of laws, regulations, or procedures;
>
> (iii) The need to review a decision by an immigration judge or the Service that is not in conformity with the law or with applicable precedents;
>
> (iv) The need to resolve a case or controversy of major national import;
>
> (v) The need to review a clearly erroneous factual determination by an immigration judge; or
>
> (vi) The need to reverse the decision of an immigration judge or the Service, other than a reversal under § 1003.1(e)(5).

8 C.F.R. § 1003.1(e)(6) (2012). Accordingly, we have recognized that "even if one of the six criteria

for three-member panel review were presented in a particular case, the Board need not empanel a

multi-member decision-making body but may do so in its discretion." *Koussan v. Holder*, 556 F.3d 403, 415 (6th Cir. 2009), *abrogated on other grounds by Judulang v. Holder*, 132 S. Ct. 476 (2011).

While the Harutyunyans invoke the Board's enabling rules to support their argument, they fail to expressly identify which provision of the empaneling rules their case would fall under. Lacking developed argumentation on the issue, we generally would consider such an argument a forfeited one. *See Johns v. Holder*, 678 F.3d 404, 409 (6th Cir. 2012). To the extent that the Harutyunyans' substantial evidence claims constitute a "need to review clearly erroneous factual determination," however, our review above suggests that there was no such need here. In any event, even if one of the six enumerated circumstances of section 1003.1(e)(6) arose, the Board enjoys broad discretion to impanel one judge instead of three, and it did not exceed that discretion here. *See Koussan*, 556 F.3d at 415; *Tapia-Martinez v. Gonzales*, 482 F.3d 417, 425 (6th Cir. 2007) ("Even [with a need to review a clearly erroneous factual determination], the regulation does not guarantee a three-member BIA panel as a matter of right.").

The Harutyunyans' reliance on the Fourth Circuit's decision in *Quinteros-Mendoza* is misplaced. *Quinteros-Mendoza* addressed whether the court had *jurisdiction* to review the BIA's decision to assign a single-judge in light of the section 1003.1(e)(6) factors. *See* 556 F.3d at 164 ("We thus hold that we do have jurisdiction to decide whether the BIA's decision to streamline a case under 8 C.F.R. § 1003.1(e)(5)-(6) (2008) was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"). That question is not before us today. The *Quinteros-Mendoza* court's central holding is inapposite to the Harutyunyans' argument in this regard; indeed, our sister circuit never reached the merits of the petitioners' section 1003.1(e)(6) argument. *See id.*

("[T]he BIA's subsequent action moots the need to remand Quinteros-Mendoza's case to a three-member panel.").

Finally, we address the Harutyunyans' novel claim that failing to assign their case to the same BIA decisionmaker on their second administrative appeal constituted a violation of due process. The BIA's organizational regulations do not require such an extraordinary guarantee in the administrative appeals process; to the contrary, the rules only state that "*a* single Board member" shall be assigned to decide a case. *See, e.g.*, 8 C.F.R. § 1003.1(e) (emphasis added). If the Harutyunyans are claiming a constitutional due process violation arising from the BIA's failure to assign their case to the same decisionmaker, that argument is also without merit. *Cf. Fitzgerald v. Withrow*, 292 F.3d 500, 503 (6th Cir. 2002) ("We would never hold that a trial court was constitutionally required to honor a defendant's request for a bench trial before a particular judge."); *see also Firishchak v. Holder*, 636 F.3d 305, 310 (7th Cir. 2011) ("The Fifth Amendment's due process clause guarantees the right to an impartial decisionmaker, . . . but not to a particular judge." (citations omitted)). Discerning no due process violation in this matter, we cannot grant the petition for review on such grounds.

V.

For the reasons above, we **DENY** the petition for review.