NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0172n.06

Case No. 21-3670

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Apr 26, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| HERNANDEZ SEBASTIAN-NICOLAS, | ) | |
| Petitioner, | ) | |
| | ) | |
| | ) | ON PETITION FOR REVIEW |
| v. | ) | FROM THE UNITED STATES |
| | ) | BOARD OF IMMIGRATION |
| MERRICK B. GARLAND, Attorney General, | ) | APPEALS |
| Respondent. | ) | |
| | ) | |

Before: SUTTON, Chief Judge; WHITE and THAPAR, Circuit Judges.

THAPAR, Circuit Judge. Hernandez Sebastian-Nicolas petitions for review of a removal order. Because the agency did not err, we deny his petition.

I.

Hernandez Sebastian-Nicolas is a native and citizen of Guatemala.[1] Hernandez entered the United States in 2013, when he was thirteen years old. Soon after, the Department of Homeland Security launched removal proceedings against him. As relevant here, Hernandez applied for asylum and withholding of removal based on his alleged membership in a particular social group: "young indigenous Guatemalan males lacking in parental protection." A.R. 167. He also applied for protection under the Convention Against Torture (CAT).

In November 2018, an immigration judge held a hearing on Hernandez's applications. For the first time, Hernandez told the immigration judge that he preferred to speak an indigenous

---

[1] Hernandez Sebastian-Nicolas refers to himself as "Hernandez," so we follow suit.

language called Chuj rather than Spanish. The immigration judge noted that Hernandez had been to court "on a number of different occasions" and "never once mentioned" that he spoke Chuj. *Id.* at 157. The immigration judge then questioned Hernandez about his fluency in Spanish. Hernandez confirmed that he spoke Spanish, had marked Spanish on his asylum application, brought his own Spanish interpreter to his asylum interview, and studied Spanish in school in Guatemala. But he denied being fluent. The immigration judge nevertheless concluded that Hernandez spoke enough Spanish to proceed with the hearing.

Then came Hernandez's testimony. He identified himself as indigenous Chuj. And he explained that both his parents had moved to the United States by 2005, leaving him to live with his grandparents. When asked why he was afraid to return to Guatemala, Hernandez testified that "criminals can kill [him]" there. *Id.* at 170. He described how a gang member had called his home threatening to kill him unless he paid 1,000 quetzals, the currency in Guatemala. Hernandez gathered money that his parents had sent him and traveled to the designated meeting place. He met two or three men there, one of whom put a knife to Hernandez's neck. Once Hernandez gave them the money, they let him go.

According to Hernandez, this pattern repeated itself four more times. Each time, Hernandez went alone to meet the men, and he never told anyone what was happening (including his parents and the police). He explained that he didn't tell his parents because he was worried it would lead them to stop sending him money. And he didn't tell the police because the nearest police station was a forty-five-minute walk away, and a classmate had told him that gang members pay the police. Eventually, Hernandez could not afford the gang's demands. So he fled to the United States. Along with this testimony, Hernandez supplied documentary evidence detailing the conditions in Guatemala, including articles and reports describing corruption, gang violence, and

discrimination. At the end of the hearing, Hernandez agreed with the immigration judge that he was "completely able to understand the questions" and "provided what appeared to be very good answers to the questions." *Id.* at 197.

After considering the evidence, the immigration judge denied Hernandez's applications. She denied Hernandez's asylum and withholding of removal applications after concluding, among other things, that Hernandez failed to establish past persecution or a well-founded fear of future persecution based on membership in a particular social group. And she denied Hernandez's CAT application because he failed to show it was more likely than not that he would be tortured by or with the acquiescence of a public official.

The Board of Immigration Appeals affirmed the denial of Hernandez's applications. And it rejected Hernandez's contention that he was denied a fair hearing because the interpreter spoke Spanish rather than Chuj. Hernandez then petitioned this court for review.

II.

When the Board reviews the immigration judge's decision de novo and issues its own separate opinion, we review the Board's opinion as the final agency determination. *Guzman-Vazquez v. Barr*, 959 F.3d 253, 259 (6th Cir. 2020). But we also review the immigration judge's decision to the extent the Board adopts its reasoning. *Id.* When evaluating the agency's decision, we generally review questions of law de novo. And we defer to the agency's factual findings if they are "supported by reasonable, substantial, and probative evidence on the record considered as

a whole." *Id.* (citation omitted). An agency's factual findings are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* (citation omitted).

### III.

Hernandez makes three main arguments on appeal. First, he contends that the agency erred by denying his applications for asylum and withholding of removal. Second, he contests the agency's conclusion that he failed to establish entitlement to protection under the CAT. And third, Hernandez argues that the immigration judge denied him due process because his interpreter spoke Spanish rather than Chuj. We take each in turn.

### A.

We begin with the agency's conclusion that Hernandez failed to establish that he is entitled to asylum or withholding of removal. To receive asylum, Hernandez must show that he's "unable or unwilling" to return to Guatemala because of "past persecution or a 'well-founded fear' of future persecution" based on his "race, religion, nationality, membership in a particular social group, or political opinion." *Bonilla-Morales v. Holder*, 607 F.3d 1132, 1136 (6th Cir. 2010) (quoting 8 U.S.C. § 1101(a)(42)); *see* 8 U.S.C. § 1158(b). He must also establish that the alleged protected ground—here, membership in a particular social group—"was or will be at least one central reason" for his persecution. 8 U.S.C. § 1158(b)(1)(B)(i); *see Umaña-Ramos v. Holder*, 724 F.3d 667, 671 (6th Cir. 2013).

Similarly, to succeed on his withholding claim, Hernandez must show that there is a "clear probability" that he will be persecuted if forced to return to Guatemala and that the persecution would be based on his "membership in a particular social group." *Umaña-Ramos*, 724 F.3d at 674

(cleaned up); *see Guzman-Vazquez*, 959 F.3d at 274 (holding that withholding applicants "must demonstrate that a protected ground was at least one reason for their persecution").

Start with past persecution. In his petition, Hernandez contends that he is a member of a cognizable particular social group: "young indigenous Guatemalan males lacking parental protection." Pet'r Br. 30. Even if that were true, however, nothing in the record compels the conclusion that the gang members targeted him because of his membership in that group rather than out of "sheer criminal opportunism." *Zaldana Menijar v. Lynch*, 812 F.3d 491, 501 (6th Cir. 2015). Indeed, Hernandez said the gang members knew he could pay them because his parents were sending him money. In line with that testimony, the agency concluded that "the gang members who extorted [Hernandez] were motivated to do so *solely* because they were aware that [his] parents were sending him money." A.R. 4 (emphasis added); *see also id.* at 115. Hernandez contests that finding, arguing that his particular social group was another reason for the extortion. But none of the evidence he points to—for example, testimony and documentary evidence regarding police corruption, gang violence, and the marginalization of indigenous communities like the Chuj—is inconsistent with the agency's conclusion.[2] Thus, Hernandez has not established past persecution on account of his particular social group.

Nor has Hernandez established a well-founded fear of future persecution because of his membership in that particular social group. Among other things, Hernandez must show that "there is a reasonable possibility of suffering such persecution" if he were to return to Guatemala. *Abay v. Ashcroft*, 368 F.3d 634, 637 (6th Cir. 2004) (quoting *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998)). Because Hernandez didn't establish past persecution, he must "independently

---

[2] At times, Hernandez appears to suggest that he was persecuted on account of his race, indigenous Chuj. But he failed to exhaust this claim before the agency, so we cannot consider it here. *See Ramani v. Ashcroft*, 378 F.3d 554, 558 (6th Cir. 2004).

establish a well-founded fear of future persecution." *Kukalo v. Holder*, 744 F.3d 395, 401 (6th Cir. 2011). This can "be based on either a likelihood of harm specifically targeted at the applicant or a 'pattern or practice' of persecuting others similarly situated." *Yu Yun Zhang v. Holder*, 702 F.3d 878, 880 (6th Cir. 2012) (order) (quoting 8 C.F.R. § 208.13(b)(2)(iii)(A)).

To support his claim, Hernandez again points to the documentary evidence describing rampant gang violence in Guatemala and the marginalization of indigenous communities. But that evidence doesn't establish a reasonable probability that Hernandez himself will be "specifically targeted" for harm—let alone that he will be targeted on account of his particular social group. *Id.* Moreover, Hernandez hasn't offered evidence that the gang members continued looking for him after he left. Nor does Hernandez's evidence of general criminal activity prove that there is a pattern or practice of persecuting "young indigenous Guatemalan males lacking in parental protection." A.R. 167; *see Yu Yun Zhang*, 702 F.3d at 880; *Kukalo*, 744 F.3d at 401. So the record doesn't compel us to conclude that Hernandez has an objectively reasonable fear of persecution on account of his membership in a particular social group. *See Abay*, 368 F.3d at 637. Thus, Hernandez's asylum claim fails.

And because Hernandez's asylum claim fails and substantial evidence supports the agency's finding that he was targeted for reasons unrelated to his social group, Hernandez's withholding claim necessarily fails as well. *See Soto-Ambrocio v. Sessions*, 724 F. App'x 456, 459 (6th Cir. 2018); *see also Guzman-Vazquez*, 959 F.3d at 273–74.

B.

Hernandez also argues that the agency erred by denying his application for protection under the CAT. To qualify for this protection, Hernandez must show that it is "more likely than not" that he would be tortured if removed to Guatemala. 8 C.F.R. § 1208.16(c)(2). Torture entails "the

intentional infliction of severe mental or physical pain upon an individual by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Bi Qing Zheng v. Lynch*, 819 F.3d 287, 294–95 (6th Cir. 2016) (citation omitted). The acquiescence of a public official requires the official to have prior knowledge of the torture and "breach his or her legal responsibility to intervene to prevent" the torture. *Miguel-Jose v. Garland*, 852 F. App'x 885, 890 (6th Cir. 2021) (citation omitted).

Here, the agency concluded that Hernandez failed to establish that "it is more likely than not that he would be tortured" with the knowledge and acquiescence of public officials. A.R. 116. That conclusion is supported by substantial evidence. As Hernandez himself testified, he never notified the police about the gang's efforts to extort him because a classmate told him that gangs pay off the police. But Hernandez never complained to the police, so "it is impossible to know how they would have responded to the call of duty." *Miguel-Jose*, 852 F. App'x at 890. And although Hernandez's filings contain some evidence of corruption and police collusion, they do not establish a "*particularized* threat of torture"—that is, they don't establish that it's more likely than not Hernandez himself would be tortured with the acquiescence of public officials. *Cruz-Samayoa v. Holder*, 607 F.3d 1145, 1155 (6th Cir. 2010) (citation omitted); *see* A.R. 6. Thus, the record does not compel us to conclude that it's more likely than not Hernandez would be tortured if removed to Guatemala.

## C.

Finally, Hernandez contends that he was denied due process during his hearing before the immigration judge because his interpreter spoke Spanish rather than Chuj. To establish a due-process violation, Hernandez must show a defect in the "fundamental fairness" of his removal proceedings. *Abdallahi v. Holder*, 690 F.3d 467, 472 (6th Cir. 2012). And that defect must have

prejudiced him. *See id.* To establish prejudice, Hernandez "must show that the due process violations led to a substantially different outcome from that which would have occurred in the absence of these violations." *Id.* (citation omitted); *see also Kruze v. Lynch*, 615 F. App'x 857, 865 (6th Cir. 2015) ("In order to establish a due-process violation based on erroneous translation, the petitioner must show error and substantial prejudice." (citation omitted)).

Hernandez has not established that he was prejudiced by the use of a Spanish interpreter. To begin, the immigration judge found that Hernandez spoke Spanish sufficiently well to proceed with a Spanish interpreter. After all, Hernandez didn't deny fluency in Spanish until his removal hearing, after several hearings had been completed. And although Hernandez denied that he was "fluent" in Spanish, he confirmed that he nonetheless spoke it (both in his testimony and his asylum application, in which he marked Spanish as a language in which he was indeed "fluent"), had brought his own Spanish interpreter to his asylum interview, studied Spanish in school in Guatemala, and received instructions in Spanish at his Tennessee high school whenever he struggled with English.[3] Substantial evidence therefore supports the immigration judge's conclusion that Hernandez was proficient in Spanish.

Moreover, Hernandez has not shown that any alleged translation issues prejudiced him. He points out that his interpreter asked him to repeat answers and to slow down. But that alone does not establish a procedural-due-process violation. *See Fall v. Gonzales*, 218 F. App'x 385, 389 (6th Cir. 2007). To be sure, Hernandez also identifies several supposed mistranslations. At one point, for example, Hernandez meant to say that he met the gang members in a "forest," but this was misinterpreted as "on a mountain." A.R. 22–24, 70. Either way, this minor detail was

---

[3] Hernandez points out that he was interviewed by U.S. Citizenship & Immigration Services and the interviewing officer marked "Chuj" as his "native" language on the application. But the interviewing officer also indicated that Hernandez was "fluent" in Spanish.

irrelevant to the agency's decision and had no impact on Hernandez's case. *See Fall*, 218 F. App'x at 389 (finding no due-process violation when the translation issue "concerned testimony that was not critical or even relevant to" the immigration judge's decision).

Hernandez also notes that he responded "no" when asked whether gang members threatened him, but "yes" when asked if they put a knife to his throat. A.R. 173. But again, even if this seemingly inconsistent answer resulted from a translation issue, it did not affect the outcome of the hearing given the agency's determination that Hernandez could not establish a nexus between the harm he suffered and his particularized social group. Nor has Hernandez explained, on appeal, what he would have said or done differently had he received a Chuj interpreter. *See Kruze*, 615 F. App'x at 865–66 (concluding that the petitioner could not establish a due-process violation, in part, because she had "not indicated what additional corrections she would have made had" there not been translation issues). Finally, at the end of Hernandez's testimony, he agreed that he was "completely able to understand the questions." A.R. 197. Taken together, we cannot conclude that Hernandez was prejudiced by the use of a Spanish interpreter.

\* \* \*

We deny Hernandez's petition.